**James D. HODGSON, Secretary of Labor, U. S. Department of Labor, Plaintiff,**

**v.**

**DAISY MANUFACTURING COMPANY, a Corp., Defendant.**

**Civ. No. 563.**

United States District Court, W. D. Arkansas, Fayetteville Division.

Sept. 30, 1970.

William Fauver, Donald Elisburg, Sylvia Ellison, Attys. with U. S. Dept. of Labor, L. H. Silberman, Sol., U. S. Dept. of Labor, Washington, D. C., for plaintiff.

James Gilker, Garner & Parker, Fort Smith, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

This is an action commenced on September 7, 1965, by the Secretary under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq., to enjoin defendant from violating the Act's equal pay provisions by maintaining a wage differential between men and women in five departments of its plant in Rogers, Arkansas. The Secretary also seeks recovery of back wages from June 11, 1964, for the affected employees in the event the court finds in his favor.

Plaintiff contends that defendant's job classification system, which separately classifies "heavy" and "light" (male and female) jobs, is arbitrary and lacks any rational purpose or basis other than the perpetuation of sex-discriminatory pay rates to its women workers. He contends that the work required of men and women punch press operators, paint line tenders, sub-assemblers, final assemblers, inspectors, and packers, is plainly equal within the meaning of the Act, which requires equal pay for equal work without regard to sex.

Defendant admits that it is an employer engaged in commerce and in the production of goods for commerce within the meaning of the Act, and that its employees have been subject to the Act's equal pay provisions since June 1964. Defendant also admits that the respective job pairs require equal skill and that the women workers have always been excluded as a class from the higher paying male job classifications.[1] Defendant de-

---

1. Plaintiff does not allege herein a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. which makes it an unlawful employment prac- tice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such in-

nies, however, that the wage differentials are discriminatory under the Act's equal pay provisions principally for the reason that the "heavy" or male jobs require greater physical effort.

The case was tried to the court, without a jury, on eight non-consecutive days in December 1969, and during the course of the trial the court and representatives of the parties visited the plant site. The following shall constitute the findings of fact and conclusions of law of the court, as contemplated by Rule 52(a), Fed.R.Civ.P.

The court has jurisdiction by virtue of 29 U.S.C. § 217.

The equal pay provisions were added to the Fair Labor Standards Act in 1963 by Pub.L. 88–38 (77 Stat. 56). Section 6(d) (1) of the Act, 29 U.S.C. § 206(d) (1), provides that:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; *Provided*, that an employer who is paying a wage rate differential which would be in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

Section 6(d) (3) provides that for purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of § 6(d) (1) shall be deemed to be unpaid minimum wages or overtime compensation under the Act. Under § 4, employers who, like defendant, were not covered by a collective bargaining agreement in effect at least 30 days prior to the date of enactment of the legislation, were given a grace period of one year (until June 11, 1964) to commence compliance.

The defendant Daisy is a Nevada corporation doing business at Rogers, Arkansas, where it is engaged in the manufacture of air rifles, noise guns, parts therefor and related products. Daisy's full line of products requires the production of numerous common parts of varying sizes and dimensions, such as shot tubes, barrels, air tubes, shot tube channels, jackets, plungers, triggers, muzzles and stocks; the assembling of these parts into the completed product; and the inspection and packing of the completed guns for sale and shipment in interstate commerce.

Production generally follows an assembly process which involves the movement of materials and processing of operations through the following departments: Press; Paint; Sub-Assembly; Final Assembly; and Packing. Plaintiff asserts equal pay violations regarding female punch press operators, paint line tenders, sub-assemblers, final assemblers, inspectors, and packers. Prior to this action, Daisy designated its operations as either "male" or "female." Since this suit, defendant has redesignated "male" as "heavy" and "female" as "light," but has at all times excluded women as a class from the higher paying "male" or "heavy" designations. At all times, Daisy's male employees have been paid 10 cents an hour more than their female counterparts. Other than press

operators, all of the men in question have been paid an identical rate (now $2.10 an hour) and all of the women in question have been paid an identical rate (now $2.00 an hour). Male press operators, at $2.15 an hour, are paid 5 cents an hour more than the other men, and female press operators, at $2.05 an hour, are paid 5 cents an hour more than the other women. The men and women workers in question are paid strictly on an hourly basis, but 90 percent of them are governed by production quotas which the employees are expected to meet. Of the job pairs in question, only inspectors were not employed under a production quota system. Quotas are established by timing the operation and then adjusting the hourly rate, if necessary, based upon the relative efficiency of the operator, then allowing a factor for fatigue, coffee breaks, cleanup, personal time, and "stock chasing" (material handling) if it applies to the operation. On "light" operations, the factor for fatigue, coffee breaks, cleanup and personal time is 15 to 20 percent. On "heavy" operations, it is usually 5 to 10 percent above the women's allowance, primarily as a result of material handling occasionally performed by male employees. Accordingly, the defendant generally sets substantially lower production quotas for operations designated as "heavy."

The system of production used by Daisy is based upon an engineering method which involves the analysis of the production of each part into a series of separate operations. Each separate operation performed on each part has its own production number and quota. For example, the production of the barrel for the model 1894 air rifle involves eight separate steps within the press department alone. It is not uncommon for an employee to work on many operations over a period of 60–90 days, but men work exclusively on operations designated "heavy" and women work exclusively on operations designated "light." Daisy has never, however, tested its women employees for "heavy" operations; it does not have or use pre-employment tests for physical strength or stamina, or ability to lift weights; and it has never prescribed height or weight standards for any of the operations. Daisy offered no evidence as to how its "heavy" and "light" operations were originally chosen.

 In order to establish a prima facie case regarding the female jobs in any of the departments in question, plaintiff must prove that the performance of such jobs requires equal skill, effort, and responsibility, and are performed under similar working conditions as the male jobs with which they are compared. It has been held that "equal" as used in the Act means "substantially equal" and not "substantially identical" or "identical." Shultz v. American Can Co. (8 Cir. 1970), 424 F.2d 356; Shultz v. Wheaton Glass Co. (3 Cir. 1970), 421 F.2d 259, cert. den. 398 U.S. 905, 90 S. Ct. 1696, 26 L.Ed.2d 64; see also Shultz v. Brookhaven General Hospital (N.D. Tex.1969), 305 F.Supp. 424; Wirtz v. Rainbo Baking Co. of Lexington (E.D. Ky.1967), 303 F.Supp. 1049; Wirtz v. Basic, Inc. (D.Nev.1966), 256 F.Supp. 786; 29 C.F.R. § 800.100 et seq. As the Circuit Court of Appeals stated in American Can (quoting from Shultz v. Wheaton Glass Co., supra) at 424 F.2d 360:

" * * * Congress in prescribing 'equal' work did not require that the jobs be identical, but only that they be substantially equal. Any other interpretation would destroy the remedial purposes of the Act.

"The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it."

It follows that, if there are differences in male and female job requirements in the job pairs under review, the court must determine whether such differences

are substantial enough to constitute a realistic basis for the existing wage disparity, or whether such differences are unsubstantial and incidental to the performance of the primary function of the job compared. In this connection, the court must consider *actual* job requirements and performance, and not job classifications or titles. 29 C.F.R. § 800.121.

Defendant concedes that the work of male and female punch press operators requires equal skill and is performed under similar working conditions, but contends that the work of the males requires greater physical effort and job responsibility. The principal duties of the press operators are to feed metal blanks and gun parts into sundry punch presses, where they are formed, stamped, pierced, drawn, U-formed, closed, struck or re-struck and swaged; activate the press by depressing hand or foot controls; and, in the case of parts not automatically ejected by the press, remove the processed parts and stack them in containers for further processing. Women perform operations on every part which goes through the press department, most of which range in weight from a fraction of an ounce to a few ounces, and the largest parts, the barrels, weigh from about 9 ounces to one pound. Of the total press operations performed on the air rifle models 1894, 21, 25, 102 and 111, which are representative of the products made by defendant, 148 are classified as "heavy" and 233 are classified as "light." At the time of trial 28 women and 17 men worked in the press department.

Each press operator is charged with the responsibility of producing satisfactory work. At the end of the shift, each must do cleanup work, around his or her work area and enter the day's production on slips provided for this purpose. In addition, the male operators must roll their own containers of parts to the presses, either from another press or from a parts stockpile where wheeled containers full of parts are concentrated. When a female press operator completes an operation on a part, she places the part in a wheeled cart or gondola beside her press. If the next operation is performed by a male, he walks to the woman's press, a distance of a few feet, and rolls a container full of parts back to his own press. If, after a "heavy" operation is completed, the next operation is to be performed by a woman or in another department, a material handler or "stock chaser" rolls the container of parts to the appropriate location. If the next operation is not performed by a woman and the parts are not needed in another department, the male press operator rolls the parts to a stockpile. The material handling done by the male press operators involves a few trips per shift and accounts for approximately 3 to 4 percent of their work time. The company provides mechanical means for material handling, such as the wheeled cars or gondolas, and hydraulic jacks and hoists and, as a matter of company policy, Daisy's employees are not expected to do any heavy lifting or pushing by themselves, but are encouraged to get help and are in fact required to do so when lifting over fifty pounds.

Closing operations in the press department involve the use of a steel rod called an arbor or mandrel. The part to be closed is slid onto the mandrel, both are inserted into the mouth of the die, and when the press is activated the die molds or closes the part around the mandrel. After the die opens the part is stripped from the mandrel either automatically by another die operation on the same press, or manually by the operator. Manual stripping is accomplished by pulling the mandrel against a metal notch on the press. Both male and female press operators perform operations involving the use of mandrels, and both perform those which require the operator to manually strip the part from the mandrel.

Male press operators exert greater physical effort in performing some operations involving mandrels. Since mandrels form parts of varying sizes, they differ greatly in size and weight.

Barrel size mandrels weigh up to 4½ pounds, while the smallest mandrels weigh only a few ounces. Daisy assigns only males to close the larger barrels and requires substantially lower quotas than those assigned to closing operations performed by females, in part because the presses strike the larger barrels three times in closing them instead of once in the case of barrels closed by females.

The company production manager testified that closing shot tubes is a "heavy" operation for the reason that they must be air tight, which results in close tolerance on the mandrel and requires the operator to exert considerable effort to strip the part. A male press operator testified that it is in fact difficult for him to strip the shot tube for a model 25 air rifle from the mandrel. It is, however, undisputed that females perform the closing operation on the shot tube for model 177 air rifles, which is classified as a "light" operation, and carries a substantially higher quota than the shot tube closing operations performed by males. As in the case of barrel closing operations, the lower male quotas are in part attributable to the fact that the presses strike the larger shot tubes several times.

Regarding the weight of the mandrels used in closing the larger air rifle barrels and the difficulty involved in stripping closed shot tubes from the mandrels used in those operations, it must be said that closing barrels and shot tubes amounts to less than 100 operations out of approximately 4,000 performed in the press department. There is also nothing in the record indicating how much of the males' work time is consumed in closing barrels and shot tubes and whether all male punch press operators spend approximately the same amount of time on such operations. In addition, the majority of mandrel operations performed by press operators of both sexes are performed with small mandrels, and male and female operators use many mandrels of the same size.

Male press operators regularly perform low-speed press operations not involving the use of mandrels, such as forming, U-forming and swaging, and are also assigned lower quotas than their female counterparts for these operations. Daisy apparently seeks to justify the lower male quotas for such operations by the fact that the males are required to bring their own stock to the presses. In any event, all high-speed press operations are performed by women, who are required to place the part used into the die by hand and then withdraw their hand from the die area, simultaneously activating the press by depressing a foot pedal. While the high-speed presses are equipped with a sweep guard, the press may "double-trip" on occasion and at times the sweep guard, because of continual use, becomes improperly coordinated with the closing of the die. When this happens, the female operator's hand may be caught as the die closes. Since Daisy began its operations at Rogers in 1958, seven female press operators have lost one or more fingers in die-closing accidents. There is no record of any male press operator being involved in a die-closing accident. Plaintiff introduced the testimony of an industrial psychologist who stated that the risk of injury to the women on high-speed presses is a factor which causes mental stress and fatigue; an industrial engineer who made an extensive study of the male and female operations at the Daisy plant testified that the risk of losing fingers necessitates a high degree of mental and visual attention for sustained periods; and a female punch press operator of eleven years experience testified that she felt fear every day she put her hand into the die.

The Secretary's Interpretative Bulletin regarding the Equal Pay Act defines "effort" as "the measurement of physical or *mental* exertion needed for the performance of a job." (Emphasis added.) 29 C.F.R. § 800.127. The court agrees that job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, all bear on the question of "effort" required by the job. Thus, "effort" embraces the total requirements

of the job, and includes mental as well as physical exertion. It seems clear to the court that female press operators who are required to place their hands in the die in the course of operating high-speed presses expend significant mental exertion that is not required of their male counterparts.

Daisy also contends that greater job responsibility is required of its male press operators in that negligence in rolling containers of parts in work areas may result in lost time accidents to others. It is doubtful that the possibility of carelessness on the part of male press operators while engaged in material handling comes within the concept of job responsibility which is defined in 29 C.F.R. § 800.129 as "concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." More important, there is no record of a single accident involving material handling in the ten and one-half years defedant has operated its plant at Rogers, Arkansas. In short, there is no basis in fact for crediting male press operators with more job responsibility within the meaning of the Act.

In summary, male and female press operators have the same primary job function and perform essentially the same duties. Male press operators engage in occasional materials handling and exert greater physical effort in closing the larger shot tubes and barrels. Female press operators have substantially higher production quotas and exert greater mental effort when operating high-speed presses. The differences in job requirement between males and females are incidental and unsubstantial.

Stock chasers move the gun parts from the Press Department to the Sub-Assembly Department where they are sub-assembled and readied for painting and final assembly. Daisy concedes that the work of male and female sub-assemblers requires equal skill, but contends that the work of the males requires greater effort and responsibility and is performed under more disagreeable and hazardous working conditions. Sub-assemblers perform a variety of operations in connecting parts, in making sub-assemblies, which requires assembling and riveting parts, and in preparing parts and sub-assemblies for final assembly, which involves reaming, drilling, facing, rethreading and deburring gun parts. Tools commonly used by the sub-assemblers include air screwdrivers, riveting machines, drill presses, spring compressors and jigs. Of the total sub-assembly operations performed on the models 1894, 21, 25, 102 and 111 air rifles, 12 are classified as "heavy" and 87 are classified as "light."

The defendant contends that the males are required to exert greater physical effort in material handling and in lifting racks of shot tubes while brazing. Brazing is an operation performed only by males by which metal caps are welded to the ends of a shot tube by means of an acetylene torch. In addition to the actual welding, braziers are required to lift and carry racks of shot tube assemblies to and from the area where the brazing is performed. While the males who perform brazing duties also occasionally work on other operations classified as "heavy" within the sub-assembly department, Daisy classifies braziers separately from heavy assemblers and pays them $2.25 an hour. Brazing is the primary job function of the few individuals who perform it, and the operation cannot be combined with the job of heavy sub-assembler for the purpose of inflating the effort, responsibility and difficulty of working conditions inherent in the latter.

Material handling in sub-assembly is required infrequently and is performed by both male and female sub-assemblers as well as stock chasers. Metal pans containing several hundred parts are placed upon a table in a storage area in sub-assembly by the stock chasers. When an employee in that department is in need of parts, the operator or a stock chaser lifts or slides a pan of parts onto a wheeled cart or table and rolls the cart to the machine to be used. The pans

of parts must then be slid from the cart onto a work bench beside the machine. The pans vary in weight, depending upon the number of parts contained in each, with the lightest weighing approximately 50 pounds and the heaviest weighing over one hundred pounds. Operators commonly get help from other employees when lifting or sliding the heavier stock pans. While male sub-assemblers engage in material handling more frequently than females, there is no evidence indicating how much of the males' work time any additional stock chasing consumes and whether all male sub-assemblers spend approximately the same amount of time in stock chasing.

Daisy contends that greater job responsibility is required of male sub-assemblers in that improper brazing or spot facing may cause scrappage of material and material handling may cause lost time injuries to others. Spot facing is a "heavy" operation which entails applying the cutter head of a drill to the face of a shot tube. There is no evidence that all male sub-assemblers perform spot facing or, for that matter, that spot facing operations have ever resulted in scrappage of material. As herein indicated, brazing will not be included in the job requirements of heavy sub-assemblers, and there is absolutely no basis in fact for crediting male sub-assemblers with more job responsibility because of the possibility of material handling accidents, not one of which has occurred in over ten years of operation. Nor is there any merit to defendant's contention that male sub-assemblers labor under more disagreeable and hazardous working conditions than females. Daisy's argument is based primarily upon alleged unpleasantness and dangers associated with spot facing, brazing and material handling, all of which have been discredited in determining the respective job requirements and performance of males and females.

It is in fact quite clear that the job requirements of male and female sub-assemblers are essentially the same, and that any differences are unsubstantial.

The fact that the males engage in stock chasing more frequently than the females is more than offset by the substantially higher quotas assigned to the women.

The principal tasks of the paint line tenders are loading and unloading an overhead conveyor which passes through a cleaning bath, an electrostatic paint booth and an infra red drying chamber. Both men and women handle the same parts, with the women loading the conveyor and both men and women unloading it. The women hook the gun parts (except barrels) on racks called "trees," which hang a short distance from the conveyor line; they then carry the loaded trees, four at a time, over to the conveyor where other women hang them on the line. Gun barrels are loaded by the women directly onto the conveyor line from a container of parts which is brought to the paint department by a stock chaser. As the parts emerge from the bath, they are inspected and turned by one of the women in order to put them in proper position for their trip through the paint booth. As the painted parts come out of the drying chamber, they are taken off the conveyor by a man and a woman working side by side. These individuals carry the trees or racks a short distance to an area where a woman paint line tender unloads the small parts, inspects them, and puts them in boxes, after which they are transported to other departments by stock chasers. The gun barrels are unloaded from the conveyor by a male tender who inspects them and places most of them in gondolas which, when filled, are taken by stock chasers to Final Assembly. Some gun barrels are "silk-screened" before being taken to final assembly, an operation performed by two women whereby a design is imprinted upon the barrels by the use of a silk screen and a squeegee. Gun parts are usually brought to the paint department by the stock chasers, but both male and female paint line tenders occasionally bring or take away their own materials.

Daisy concedes that the work of male and female paint line tenders requires equal skill, but here also contends that

the work of the males requires greater effort and job responsibility and is performed under more disagreeable and hazardous working conditions. The defendant argues that the males exert greater physical effort in unloading the conveyor line, moving stock away from the work area, applying pressure in buffing barrels and in performing week end clean-up work.

Six men and six women work on the day shift in the paint department. One male employee is a separately classified paint machine operator and lead man who is paid $2.20 per hour. In addition to operating the paint machine, he directs the stock chasers as to what stock to bring in and instructs the female paint line tenders as to what parts to load onto the racks. Buffing, as it applies to the paint department, is an operation whereby the welding marks on the gun barrels are buffed smooth by a machine process. There are three buffing machines in the paint department, and some of the male paint line tenders infrequently perform buffing operations.[2] However, the majority of the buffing is performed by a male employee who is separately classified as a buffer and who performs no unloading or packing duties.

It is clear that some or all of the male paint line tenders from time to time perform duties in addition to unloading, inspecting and packing. Drums of paint are brought into the paint department by employees of the supply department. Four paint drums are brought in on a skid at the same time. Either the stock chasers or two of the male paint line tenders manually tilt these drums back onto a two-wheel truck and roll each one into the desired area within the department. There is, however, no indication in the record as to how much of the males' work time this task consumes or whether all male paint line tenders spend approximately the same amount of time in performing it. Some male tenders also perform an operation called "roto-

finish," which involves rust proofing certain parts and consumes approximately 30 minutes of work time. There is no evidence in the record as to how frequently the operation is performed, and it is clear that not all male tenders perform it. A male tender performs an operation called "cholene," whereby parts brought in from supply are blued and sent to other departments. The operation requires considerable heavy lifting, but here again there is no indication in the record of how much work time it consumes and whether all male tenders spend approximately the same amount of time in performing it. The same is true regarding the operation of a spinning machine in the paint department which is used to quick dry certain parts which are needed immediately in other departments. There is no evidence indicating whether all male tenders operate the machine or how much work time it consumes or how frequently the operation is performed. A male tender operates a machine which "roto-finishes" steel shot. The operation consumes approximately 45 minutes of work time and involves considerable lifting. Here again, there is no evidence indicating how frequently the operation is performed and whether all male tenders perform it on an approximately equal basis.

The problem confronting the court is basic. All male paint line tenders are paid $2.10 per hour and all female paint line tenders are paid $2.00 per hour. There is little disagreement regarding the actual job requirements and performance of the women. In order to find that additional job requirements and performance on the part of the males are substantial, the court must be in a position to reasonably infer the amount of work time consumed in performing such duties and whether all male paint line tenders spend approximately the same amount of work time in performing them. Without such information, the court is left to engage in

---

2. In fact, the only male paint line tender who testified regarding buffing duties stated that he had operated a buffing machine only two or three times in the three years he had worked in the paint department.

speculation and conjecture, to which it cannot resort.

Week end clean-up involves considerable physical effort on the part of the males who perform it. The work is, however, overtime work performed only on Saturday mornings on a voluntary alternating basis by all males in the paint department, not just the paint line tenders, who are paid time and one-half while undertaking it. There is no basis in reason or logic to include overtime work in comparing the job pairs in question. Moreover, it is an inescapable fact that the male paint line tenders are not paid $2.10 per hour basic rate simply when performing week end clean-up chores; they are paid the same $2.10 per hour while engaged in the regular forty-hour work week at a time when the women are performing substantially equal work. It is clear that such clean-up duties are incidental to the primary job requirements of male and female paint line tenders.

Material handling is performed infrequently by the male paint line tenders, and there is no evidence in the record from which the court might infer how much of their work time it consumes. Finally, any additional physical effort required to unload from the conveyor line the same parts the women load thereon is clearly unsubstantial.

There is also no merit to Daisy's contention that the work of the males requires greater job responsibility and is performed under more disagreeable and hazardous working conditions. The defendant's argument, in essence, is that carelessness in buffing and in material handling may cause lost-time injuries, that these operations also constitute work hazards, and that the week end clean-up duties are performed under disagreeable working conditions. The court has herein indicated that week end clean-up work will not be included in comparing the job pairs in question and that there is no basis in fact for inflating job requirements with the possibility of material handling accidents. The same must be said regarding the possibility of buffing accidents, as buffing is infrequently performed by the male paint line tenders and there is no evidence that a buffing accident has occurred in the many years of operation of the defendant's plant.

In summary, the work of the male and female paint line tenders is substantially equal. It is clear that some or all of the male tenders perform additional duties during the regular work week, but the court is simply unable to determine from the record the additional duties performed by each male tender and whether such duties constitute substantial differences in the work performed by the males.

The principal task of the men and women final assemblers is to complete the assembly of the various types of air rifles manufactured by Daisy. Parts are brought in from sub-assembly by stock chasers, the smaller parts in pans and the barrels, stocks and forearms in gondolas. Male final assemblers occasionally retrieve their own parts from the stockpile, which is located approximately 15–20 feet from the work bench. All of the air rifles are about the same size, but some have wooden stocks and forearms and others have plastic stocks and forearms. The males work primarily on the air rifles having wooden stocks. The same basic steps are followed by both males and females in final assembly, such as completing the plunger assembly and inserting it in the gun barrel, attaching the sights, inserting and securing the hammer and trigger assemblies, the feed chambers, the shot tube and magazine assemblies, inserting the loading tube, and assembling and securing the forearm and stock. There is a difference in procedure in that the males walk around a table to complete the various operations necessary to assemble the air rifles on which they work, while the females perform one operation in an assembly line, either working from a conveyor line or passing the parts from person to person, depending upon the type of air rifle being assembled. The females are, however, required to be familiar with each opera-

tion in the assembly process, as they frequently rotate positions as a matter of choice. The air rifles, when completely assembled, are placed on mobile racks in an upright position and transported to final packing by the stock chasers.

Here also, Daisy concedes that the work of male and female final assemblers requires equal skill, but contends that the work of the males requires greater physical effort and job responsibility, and is performed under more hazardous working conditions. The defendant argues that the males exert greater physical effort in manually inserting plunger assemblies in gun barrels, repairing air rifles, operating air-powered screwdrivers, and in material handling.

While it is true that the males, in the assembly of some air rifles, manually insert plunger assemblies by means of a hand-operated lever which compresses the spring far enough to enable them to put an anchor pin in the end, they also use an air-driven device to insert plungers in the assembly of other air rifles. The record does not reveal which air rifles require the use of a hand-operated lever or how much work time the operation consumes, or whether the operation requires significant physical strength. In any event, it is undisputed that the females also manually insert plunger assemblies in some air rifles, and there is no evidence that the work done by the males in manually inserting plungers is more difficult in any respect.

Male final assemblers do occasionally retrieve their own parts from the stockpile, principally when stock chasers are unavailable. Even when material handling is necessary, it consumes an insignificant amount of work time and the males obtain help when the containers of parts are difficult to handle. A gondola of parts usually lasts an entire work day, and a rack of stocks is required not more than twice daily.

Daisy contends that considerable physical effort is required to properly use a pneumatic screwdriver on wooden stocks, whereas very little physical effort is necessary in drilling screws into plastic stocks. The defendant essentially argues that substantial additional physical effort is necessary in connection with drilling screws into wooden stocks because the male operator must place sufficient pressure on the screwdriver to overcome the resistance offered by it when the machine is operated at a high torque setting. Some wooden stocks used by Daisy are made of relatively hard wood, and a comparatively high torque setting is necessary to make efficient use of the screwdrivers; other wooden stocks are made of soft wood, and present little difficulty. Plaintiff, on the other hand, contends that the screwdriver itself supplies all the force necessary to drill screws into stocks made of the hardest wood, and that it is only necessary for the operator to maintain contact between the screwdriver and the screw. It is undisputed that little physical effort is required to use the air screwdrivers to place screws into plastic stocks, and it is clear that significant physical effort is required when drilling screws into stocks made of extremely hard wood. Here again, however, there is nothing in the record even roughly indicating the frequency with which stocks made of hard wood are encountered, or, for that matter, the approximate amount of work time of the male final assemblers consumed in drilling screws into wooden stocks, hard or soft.

Some male employees in final assembly occasionally perform repair work on air rifles that are determined to be defective at the assembly line or those that have been rejected in the inspection area of the final packing department. The repair work usually consists of partially or completely dismantling the gun, replacing the defective part or parts and placing the parts back on the assembly line to be re-assembled. Again, there is no evidence from which the court may infer the frequency with which such repairs are performed or the approximate amount of work time

consumed or whether all male final assemblers perform repair work.

Daisy contends that greater job responsibility is required of the male final assemblers, in that failure to properly operate the air screwdrivers may result in scratches on gun barrels and stocks, and that carelessness in material handling may result in lost time injuries to others. It is of course true that gun barrels and/or stocks may be damaged if an operator allows an air screwdriver to spin off a screw and make contact with the air rifle on which he is working. There is also a greater likelihood of such an accident in operations involving the use of a stock or forearm made of extremely hard wood, as the screwdriver bit may slip from the head of the screw if insufficient pressure is applied to the screwdriver. Such accidents have occasionally taken place in final assembly, but there is no evidence that they occur with such frequency or constitute such an economic hazard as to require substantially greater job responsibility on the part of the males.

The argument of Daisy regarding the possibility of lost-time injuries resulting from material handling has been thoroughly discussed herein and need not be repeated Defendant's contention that the work of the males is performed under more hazardous working conditions is also related to the possibility of material handling accidents and will be disregarded. The work of male and female final assemblers is substantially equal and the court so holds.

Between June 11, 1964, and January, 1969, Daisy maintained a separate department for the inspection of assembled guns prior to their being moved to the packing department. These duties are presently performed by male checkers in the packing department as the result of a personnel cut-back necessitated by a decreased demand for noise guns, as opposed to B–B guns. Under the practice prevailing until 1969, final assemblers were required to cock all air rifles before placing them on the mobile racks. From final assembly, the racks were moved by stock chasers to the inspection department and there left in a storage area. Both male and female inspectors pulled racks of guns as needed distances up to 15 feet under a light and completed the inspection process. The females inspected and tested the shot tubes on all guns and, after exhausting the daily supply of shot tubes, made complete inspections of all air rifle models. In addition to their inspection work, the male inspectors performed minor repair work when necessary, such as tightening screws. The women inspected and tested the shot tubes by looking for bent tubes, checking whether the tubes contained shot, whether the spring was in place and possessed the proper tension, and whether the air tube was in the correct location within the assembly. In this connection, it was necessary to thrust or inject a gauge approximately the diameter of a "B–B" into each shot tube until it touched the air tube.

Standard procedures were followed by both males and females in performing complete inspections on air rifles. Each gun was picked up and inspected for scratches, loose screws, missing parts, defects in paint and split stocks; each was then fired for sound and, if the rifle sounded "low" or "hollow" when fired, the operator re-cocked and fired the gun. An improper sound when fired indicated, among other things, that plunger seals had been improperly packed, a defect that could occasionally be remedied by repeated firing. If re-firing did not improve the sound or if other defects were apparent, the guns were set aside on racks to be returned to the appropriate department. Both males and females regularly inspected large quantities of the same guns, although the males inspected the larger air rifles more frequently than did the females. The females also performed some light packing duties in addition to checking and inspecting shot tubes and inspecting air rifles. Guns which passed inspection were placed back on the racks on which they came and pushed a few feet across the line which divided inspection and final packing. Both males and females

pushed these racks out of inspection and into final packing, but the males performed the task more frequently.

Daisy concedes that the work of male and female inspectors required equal skill and job responsibility and was performed under similar working conditions, but contends that the work of the males required more physical effort for the reason that they performed more material handling and test fired more large air rifles than did the females. There is simply no evidence that the greater frequency with which the males performed either of these duties required substantially greater physical effort than that expended by the females. In the first place, inspecting both shot tubes and air rifles required relatively little physical or mental effort. The only procedure involved in inspecting air rifles which can be said to have required greater physical effort than that required in inspecting shot tubes is re-cocking the air rifles after test firing them, and this procedure was only necessary when the initial firing revealed a defect in the plunger assembly. The record does not reveal whether it was necessary to re-cock a substantial number of the air rifles or whether the procedure consumed a significant amount of the males' work time. In any event, it is somewhat difficult to justify a substantial wage differential between grown men and women by the fact that the males occasionally or commonly performed a procedure intended by Daisy to be regularly performed by small boys and girls. Finally, although the males performed material handling more frequently than the females, there is no evidence indicating how much of the males' work time the additional stock chasing consumed, and whether all male inspectors spent approximately the same amount of time in stock chasing. The work of the male and female inspectors was clearly substantially equal within the meaning of the Act.

Apart from the inspection work performed by the checkers, the first operation in final packing is performed by women who operate stitching machines in one end of the department. Stock chasers fold large master cartons and set them on flat-bed trucks. They then supply the stitchers with small flat cartons which hold individual air rifles. The women then stitch the individual cartons, close one end, and insert them into the master cartons, which hold either three or twelve of the smaller cartons. The stock chasers then move the trucks of cartons to the other side of the department where the actual packing takes place. The female packers take the guns off the racks, place two decals on each, drop them into individual cartons with appropriate literature and a package of "B–B" shots, close and tape the ends of the individual cartons, and drop them into a master carton. Master cartons weigh from seven to 65 pounds, depending upon the number and kind of guns they are designed to hold. The women also assemble and attach slings to those air rifles that require them prior to packing the guns into the individual cartons. This operation involves cutting cloth webbing into appropriate lengths, attaching loops and buckles, and stapling the slings to the guns.

The master cartons are trucked by the male packers to their area of the department, where they apply glue to the flaps on one end of the master pack and then turn the packs off the truck onto the floor so that each stands on the end to which the glue has been applied. After the first application of glue has dried, the male packer applies glue to the top flaps, up-ends the master pack and waits for the second application of glue to dry. After both ends have been closed and the glue has dried, he puts from 20 to 25 master cartons on a skid which stock chasers move to the finished goods warehouse for storage.

Daisy concedes the work of the male and female packers requires equal skill, but here also contends that the work of the males requires more physical effort, job responsibility, and is performed under more hazardous working

conditions. The defendant's argument regarding job responsibility and working conditions rests solely on the possibility of accidents while trucking materials and will be disregarded for reasons previously discussed. Daisy contends that the males exert greater physical effort than the females in pulling the trucks of master cartons to their area of the department, turning the loaded cartons off the trucks onto the floor, up-ending them for the second application of glue, and in stacking them onto the skids. As these are the only functions performed by the male packers, it may be reasonably inferred that such duties consume 100 percent of their actual work time. It is also clear that the males exert greater physical effort than the females when lifting and turning master cartons weighing 65 pounds, which constitute a majority of the master cartons involved. The females, however, in performing a variety of operations requiring comparatively greater mental alertness and concentration, exert greater mental effort and their jobs require greater job responsibility. The court simply cannot say that the greater physical effort expended by the males in a basic and uncomplicated operation results in a substantial overall job inequality justifying a significant wage differential. It is in fact clear that the male checkers are the only employees in the packing department whose jobs compare favorably with those of the female packers.

The facts thus clearly demonstrate that the Secretary made out a prima facie case regarding each of the job pairs in questions by proving that the male and female jobs in each case require substantially equal skill, effort and responsibility, and are performed under similar working conditions. Under the statute, the burden of proof thereupon fell upon the defendant to justify the wage differential, which it failed to do.

 Daisy's defense, when closely scrutinized, rests primarily on the often-repeated allegation that certain operations performed by the males require greater physical effort than that expended by the females. This basic argument possesses considerable merit and appeal, but the court is plainly unable to justify significant wage differentials based upon these sometimes additional and usually more physically difficult duties in the absence of evidence as to approximately how much work time such duties consume and whether all males receiving a given wage rate spend approximately the same amount of time in performing them. Shultz v. Wheaton Glass Co., supra; Shultz v. American Can Co., supra. In addition, skill, job responsibility and working conditions must be weighed along with physical or mental effort. This rather obvious generalization carries particular import regarding stock chasing duties, to which the defendant has attempted to attach considerable weight in these proceedings. It must be remembered that while stock chasing requires substantial physical effort, it requires very little skill and entails minimal job responsibility. During the work time that the males spend stock chasing, the females are generally performing operations requiring substantially greater skill and job responsibility. In determining wage classifications, an employer cannot make jobs unequal by arbitrarily according greater weight to the physical effort required by a job than the weight or value accorded to skill, job responsibility and working conditions. It would be absurd to contend, apart from the statutory exceptions, that a male stock handler should be paid more than a female chemist or computer operator, simply because the job of the male requires greater physical effort. In the same vein, the court has considerable difficulty in rationalizing the fact that Daisy pays the male packers more than the female punch press operators.

In addition, Daisy admittedly has the capacity, as a result of its extensive record-keeping efforts, to pay higher wage rates for individual operations, as opposed to jobs, which would justify higher pay. For example, Daisy could,

if it chose to do so, pay male paint line tenders a higher rate for the small amount of working time they spend in buffing operations, and pay the men and women the same wage rate when they are performing essentially the same work. The fact that the defendant did not choose to do so cannot be allowed to penalize female workers whose work is substantially equal to that of the males, and, of course, Daisy cannot now "equalize" by lowering the pay of the males.

The court has carefully searched the record for any rational basis which might explain Daisy's wage differential between men and women, and has found none. Since the Secretary established his prima facie case and the defendant has failed to prove that the discrimination in wages is based upon any factor other than sex, an appropriate judgment must be entered in favor of the Secretary.

In accordance with the above, the decree will direct the defendant forthwith to equalize the wage rates of the male and female punch press operators, paint line tenders, sub-assemblers, final assemblers and packers, and will further provide that the defendant shall promptly proceed to determine from its time and payroll records the amounts owing each of the female employees, including those formerly employed as inspectors, which have been withheld in violation of § 6(d) (1) of the Act, from June 11, 1964, up to the date their wage rate is equalized in accordance with the judgment, or, in the case of women formerly employed as inspectors, until they ceased to be employed in such capacity.

■ However, the court is of the opinion that interest on the sums found due the female employees should not be allowed. Section 17 of the Act as amended, 29 U.S.C. § 217, grants jurisdiction to the district courts "* * * for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a) (2) of this title, the restraint of any withholding of payment of minimum wages * * * found by the court to be due

to employees under this chapter * *." The statute does not provide for the recovery of liquidated damages for delay or for interest. The Supreme Court has, however, held that:

"* * * the failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. Billings v. United States, 232 U.S. 261, 284–288, 34 S.Ct. 421, 425–427, 58 L.Ed. 596. For in the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court. See, e. g., Royal Indemnity Co. v. United States [313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361], supra; Board of Com'rs of Jackson County in State of Kansas v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313.

"As our prior cases show, a persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained." Rodgers v. United States (1947), 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3.

■ It may therefore be stated as a general rule that where a statute creating a financial obligation is silent as to whether the obligation carries interest, the courts may in the exercise of their discretion award interest if justified by an appraisal of the intent of Congress

in enacting the statute and by the relative equities between those benefited and those upon whom the obligation has been imposed. In Brooklyn Savings Bank v. O'Neil (1944), 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, the Supreme Court held that it was improper to award interest under Section 216(b) of the Act, because an employee could obtain liquidated damages thereunder and that interest and liquidated damages serve the same function. The Court stated at 324 U.S. 715, 65 S.Ct. 906:

" * * * Section 16(b) authorizes the recovery of liquidated damages as compensation for delay in payment of sums due under the Act. Since Congress has seen fit to fix the sums recoverable for delay, it is inconsistent with Congressional intent to grant recovery of interest on such sums in view of the fact that interest is customarily allowed as compensation for delay in payment."

Congress, however, included no liquidated damages provision in either § 216 (c) or § 217. In addition, when Congress enacted the 1961 amendments to the Act, it clearly indicated an intent to deny liquidated damages as compensation in a suit brought by the Secretary under § 217. In Conference Report No. 327, a statement by the managers of the amendments on the part of the House of Representatives, the authors stated:

"The committee of conference adopted provisions (secs. 16(b) and 17) contained in the Senate amendment but not in the House bill, dealing with enforcement of the minimum wage and overtime pay requirements of the act. Under these provisions, the Federal district courts would be authorized, in injunction actions brought by the Secretary of Labor, to issue court orders requiring employers to cease unlawful withholding of minimum wages and overtime compensation found by the court to be due to employees under the act. In such actions *only the minimum wages and overtime pay found due under the act may be awarded and no award shall be made of any additional amount as liquidated damages.*" (Emphasis supplied.) 2 U.S.Code Cong. and Admin.News, p. 1713, 87th Cong., 1st Sess. (1961).

■ The court agrees that liquidated damages and interest serve the same function and may thus reasonably infer that Congress did not intend to award compensation for delay in payment of minimum wages and/or overtime compensation in actions brought by the Secretary, as opposed to those brought by employees of an offending employer.

A weighing of the equities also dictates that interest should not be allowed. There have, of course, been many instances in which employers have demonstrated a rather obvious lack of good faith in cases arising under the amended Act, primarily involving willful ignorance or obstinance in the face of unambiguous administrative rulings or settled case law. There are, on the other hand, many instances in which employers, acting in good faith and without adequate warning, are surprised to find themselves being sued for immense sums in retroactive wage payments, liability innocently incurred when the law's applicability to them was open to legitimate doubt.

In the early years of the Act, the granting of liquidated damages was mandatory in actions under Section 216(b). Brooklyn Savings Bank v. O'Neil, supra. In 1947, Congress, recognizing the possibility of good faith and surprise on the part of employers, enacted the Portal-to-Portal Act, 29 U.S.C. § 251 et seq., finding that:

" * * * the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the result that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about

financial ruin of many employers and seriously impair the capital resources of many others; * * * (3) there would be created both an extended and continuous uncertainty on the part of industry, both the employer and employee, as to the financial condition of productive establishments and a gross inequality of competitive conditions between employers and between industries; (4) employees would receive windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay; (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in * * *."

Accordingly, Congress established defenses to such actions for back pay where the employer had no reason to know that he was in violation of the Act. Thus, good faith reliance on administrative rulings, 29 U.S.C. § 259, was made an absolute defense in an action to recover back pay and ordinary good faith conduct in the form of a reasonable belief on the part of an employer that his act or omission was not a violation of the Act was made a defense to claims for liquidated damages. 29 U.S.C. § 260.

Similar considerations apply in determining whether to award interest. This action primarily involved an issue of law which was novel at the time the suit was commenced, in 1965, and concerning which this court has only recently been provided with binding precedent. The Third Circuit Court of Appeals (Shultz v. Wheaton Glass Co., supra, reversing Wirtz v. Wheaton Glass Co. (D.N.J.1968, 284 F.Supp. 23) and more recently the Eighth Circuit Court of Appeals (Shultz v. American Can Co., supra) have construed the word "equal" as used in the Act, to mean "substantially equal" as opposed to "substantially identical." This construction of one of

the essential elements of the Act is contrary to the meaning which might in good faith be inferred by an employer from a fair reading of the legislative history of the statute. See 108 Cong.Rec. pp. 14767 and 14771. The fact that the law as it applied to the defendant was unsettled for almost all of the five years this suit has been pending is clearly a factor bearing on the question of good faith. Kelly v. Ballard (S.D.Cal.1969), 298 F.Supp. 1301. Few employers could satisfy a test of good faith if required to correctly anticipate judicial precedent.

The court would add that over four years elapsed from the date this action was filed to the date of trial, a delay caused primarily by inaction on the part of the Secretary. It must be said in all fairness that personnel changes occurred in the Department of Labor which were doubtlessly unavoidable but which nonetheless necessitated postponements which can hardly be said to be the fault of defendant. It would be clearly inequitable to award interest on the sums due herein, and the court will not do so.

■■ Nor will the defendant be enjoined from violating the Act in the future. No intent on the part of the defendant to violate the Act has been shown, and there is nothing in the record indicating that Daisy will not abide by the Act in the future. Injunctive relief is used not to punish an employer for past violations, but to prevent future violations. Wirtz v. Lone Star Steel Co. (5 Cir. 1968), 405 F.2d 668; Buckley v. Wirtz (10 Cir. 1964), 326 F.2d 838; Wirtz v. Old Dominion Corp. (E.D.Va. 1968), 286 F.Supp. 378.

Plaintiff shall make a representative available to assist in making the wage computations herein directed. Such determination of amounts owing shall be approved by counsel for the parties, and shall be subject to the supervision of the court. The computations shall identify and name the affected employees and state the amount due each, and shall be attached to the decree as Exhibit A within 30 days of the date of the judgment.

Such determination of amounts owing shall draw interest at the rate of 6 percent per annum from the date of the filing of the computations in the total amounts set forth in Exhibit A to be attached to the decree until the date such sums, less legal deductions required by law, are tendered to plaintiff. Plaintiff shall distribute such sums to the persons named in Exhibit A, or to their surviving heir or heirs if that is necessary, and any money not so distributed by the plaintiff within three (3) years, because of plaintiff's inability to locate the proper persons or because of such persons' refusal to accept such money, shall be covered into the Treasury of the United States as miscellaneous receipts.

Costs shall be taxed against the defendant. Judgment shall be entered in accordance with the above.