No. 12326

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

ROBERT ELMER GLICK, et al.,

Plaintiffs and Respondents,

-vs-

THE STATE OF MONTANA, ACTING BY AND
THROUGH THE MONTANA DEPARTMENT OF
INSTITUTIONS,

Defendant and Appellant.

---

Appeal from: District Court of the Fifth Judicial District,
Honorable John B. McClernan, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana.
Lawrence D. Huss and William N. Jensen, Assistant
Attorney Generals argued, Helena, Montana.

For Respondents:

Corette, Smith and Dean, Butte, Montana.
Kendrick Smith argued, Butte, Montana.

---

Submitted: February 26, 1973

Decided: APR 9 - 1973

Filed: APR 9 - 1973

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment entered for plaintiffs in the district court of the fifth judicial district, Madison County, and against defendant State of Montana. The judgment was in the amount of $489,289.36.

Plaintiffs are twenty-six employees of the Montana Children's Center. They filed a complaint on June 25, 1969, seeking to recover wages and overtime allegedly due to them under the Federal Fair Labor Standards Act for a time period between February 1, 1967 to January 31, 1969. The complaint consisted of twenty-six counts, one for each plaintiff. An amended complaint was filed stating causes of action under both state and federal law; later the first cause of action under state law was withdrawn.

The matter was argued before two district judges resulting in the granting of a limited summary judgment by Judge Frank Davis. Judge Davis found plaintiffs were entitled to the benefits and protection of the Fair Labor Standards Act. That decision was appealed to this Court which sustained the trial court's decision on liability and returned the cause to the district court for determination of the amount due each plaintiff. Glick v. State of Montana, 157 Mont. 204, 485 P.2d 42.

Thereafter, the district court sitting without a jury on January 3 and 4, 1972, heard the testimony presented and took the matter under advisement. On February 7, 1972, the court issued its findings of fact and conclusions of law.

Thereupon, defendant State filed consolidated motions to amend the judgment and for a new trial. Upon denial of its motions, it now appeals.

Four issues are presented for review:

1. Did the court err in its findings as to the number of hours worked by each plaintiff to include an average of eight hours overtime?

- 2 -

2. Did the court err in computing the "regular rate of pay" under the Fair Labor Standards Act?

3. Did the court err in finding liquidated damages which in effect doubled the award?

4. Did the court err in awarding attorney fees in the amount of $140,000?

To properly consider the first issue it is necessary to consider the original employment agreement. That agreement varies between male and females only insofar as some of the male plaintiffs did shifts as night watchmen as part of their duties, and those additional hours must be compensated for. Typical of those who worked at the Children's Center are plaintiffs Glick. Mr. Glick testified that he sought employment for himself and his wife in 1964. He was interviewed by Mr. Finch of the Children's Center. Glick testified as to the periods of employment on the basis of a twenty-four hour day, and that "we was allowed one part of one day, we'll say, from I think it run from 7 o'clock in the morning until 9 o'clock at night in one week/were allowed that off, and the next week we were allowed from 7 o'clock in the morning until all that day and all that night until 7 o'clock the next night off." Later during the period in question, from 1967 to 1969, as houseparents the Glicks got Monday and Sunday off.

Mr. Balkovatz, superintendent of the Children's Center, testified as to the work hours and conditions:

> "* * * I was not directly involved in the interviewing of each and every one of the individuals, but I instructed my staff upon interviewing these people that they were to instruct them specifically that they would have to live in, they would have two days off a week, that they would be required to live in for 24 hours, and also they would be instructed too that they would have a two-hour rest period during the school hours or during the 180 school days; and we also told them that in the summer in the event we were able to provide additional staffing to augment our program we would remove the children from their cottage and this would give them additional free time."

He also testified that in his opinion each employee averaged about two hours off a week over and above sleep time and the two normal hours off each day.

- 3 -

Some of the plaintiffs had been employed over twenty years, while others began their employment in the 1950's and 1960's. All had similar working conditions, as set forth above, and none of them had kept records. The State likewise had no provision prior to February 1, 1969, to record the actual hours worked, as the employment agreement was for a twenty-four hour day.

At the completion of the State's case, counsel for both plaintiffs and defendant entered into the following stipulation offered by plaintiffs' attorney as to those plaintiffs not testifying.

> "* * * we would now ask counsel for the State to stipulate that if the other Plaintiffs were called, they would testify in almost the same way as Mrs. Moore, that they had 8 hours of effective sleep and during the daytime hours had one hour of free time available only during school days, and that is the only effective time off that they would testify they had during these periods * * *."

The trial court found plaintiffs worked an average of sixteen hours per day, and night watchmen worked sixteen and two-tenths hours per day, on a five day week. The testimony given by Stewart Moore, Margaret Moore, Harry Helton, and the Roslings, reveals the trial court erred in setting the total work week as eighty hours per week, plus one hour extra for those who performed night watchman duty. The sum total of the evidence shows work weeks running from sixty-five to seventy-five hours per week, which would average closer to seventy hours per week. Due to this obvious error in the record, the case must be returned to the district court for recomputation.

We note that on recomputation, the record indicates as to night watchman time the plaintiffs did not perform these duties for the last six months of the disputed period.

Defendant's second issue relates to the trial court's method of determining the regular rate of pay under the provision of the Federal Fair Labor Standards Act. The issue involves a novel question of the relationship between the Fair Labor Standards Act and Montana's constitutional provision for an eight hour day, and

statutory provision for an eight hour per day work day.

The formula adopted by the trial court was:

Monthly wage x 12 month year ÷ 52 weeks = Weekly wage.

Weekly wage ÷ 40 hrs/wk = Regular rate of pay.

Defendant State argues the court erred in using an artificial base of forty hours as a divisor in determining the regular rate of pay. Further that Fair Labor Standards Act cases must be computed in accord with the decisions of the various federal district courts, circuit courts of appeal, and the United States Supreme Court, and these court decisions have adopted, in an unbroken series of cases, the following formula to establish the regular rate of pay:

Monthly wage x 12 mo/yr ÷ 52 weeks/yr = Weekly wage.

Weekly wage ÷ Actual no hrs worked/wk = Regular rate of pay.

We note both formulas are the same in determining the weekly wage, but that in determining the regular hourly rate, by using the actual number of hours worked, the regular rate of pay decreases as the number of hours worked increases.

Defendant cites and relies upon leading United States Supreme Court cases for setting forth the criteria for the above formula. Overnight Motor Transport Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L ed 1682; Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L ed 29; Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 68 S.Ct. 1186, 92 L ed 1502.

However, as noted by plaintiffs, the above citations do not consider the question considered here by the district court -- a state with an eight hour constitutional provision plus a statutory provision so providing. Plaintiffs argue the Federal Fair Labor Standards Act provides a minimum base and that states can give greater benefits to the workers of their state.

In support of their position plaintiffs' argue that the court's finding No. 4, relying on Montana's Constitution and statute is controlling. The district court's finding No. 4 reads:

"4. On the issue of the hourly wage rate, the Court finds and determines that by reason of the provisions of the Constitution of Montana (Mont. Const. ART. XVIII, Sec.4) and by reason of the Montana Statute, R.C.M. 1947, Sec. 41-1121, a period of eight hours a day constitutes a day's work in all employments and particularly in all employments by any state government * * *."

Article XVIII, Sec. 4, of the Montana Constitution, reads:

"A period of eight hours shall constitute a day's work in all * * * employments,except farming and stock raising."

Section 41-1121, R.C.M. 1947, provides:

"A period of eight hours shall constitute a day's work in all works or undertakings carried on or aided by any * * * state government."

Plaintiffs cite and rely on a recent case from New Jersey, State v. Comfort Cab, Inc., 118 N.J.Super. 162, 286 A.2d 742, 748. The facts there concern the Fair Labor Standards Act as applied to cab drivers, but much of what was considered there is applicable here in our interpretation of what is "maximum work week" and "overtime rates" where there is a state law controlling. There the court held:

"The federal act, 29 U.S.C.A. § 218(a), mandates compliance with a state maximum workweek requirement lower than that set by the federal act. Though 'work-week' is not defined in the federal act, it is clearly the intent of the Congress that a lower state maximum hour regulation, creating an overtime arrangement more favorable to the employee than that contained in § 207 of the federal act, should prevail. Such an inter-pretation is dictated by the plain meaning of the statutory language. 'Maximum workweek' does not in fact limit the number of hours an employee may work. Missel v. Overnight Motor Transp.Co., 126 F.2d 98, 104 (4 Cir. 1942), aff'd 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, reh.den. 317 U.S. 706, 63 S.Ct. 76, 87 L. Ed. 563. It must refer to that number of excess hours worked for which an overtime rate must be paid. This conclusion is further evidenced by the utilization of the term 'workweek' in 29 U.S.C.A. § 207, where it is used in reference to the number of hours worked in excess of which the overtime rate must be paid. See, e.g., 29 U.S.C.A. § 207(a)(2)(A). The term 'maximum workweek' in 29 U.S.C.A. § 218(a) is thus synonymous with maximum hour/overtime. Accordingly, the require-ment of 29 U.S.C.A. §218(a) that a lower state maximum workweek be enforced mandates the enforcement of a state maximum hours/overtime provision more favorable to the employee than that set by the federal act. Since, as indicated, this State's maximum hour/overtime provi-sion (N.J.S.A. 34:11-56a4) does so favor employees, that

- 6 -

statute is applicable to defendant's non-
driver employees for the period February 1,
1967 to December 25, 1968, and the court has
jurisdiction over violations thereof."

Here, as in New Jersey, we have constitutional and

statutory authority on the eight hour day that cannot be disregarded.

While we give no credence to plaintiffs' argument that as a result

of the bringing of this action the State began to computerize its

payroll and the Children's Center became the first institution to

be so handled. However, commencing February 1, 1969, when the

computer payroll went into effect, it is not denied that each

employee was paid on a basis of a forty hour workweek and for

time and a half on hours worked in excess of forty. We find this

formula is proper in computing the overtime compiled during the

two year period from February 1, 1967 to January 31, 1969.

Defendant's third issue is directed to the trial court's

granting liquidated damages against defendant. The trial court's

finding of fact No. 6 reads:

"6. On the issue of liquidated damages, the Court
finds and also concludes that under the Fair Labor
Standards Act, when there has been a determination
of the amount of total wages due, less wages received,
then the amount of net wages due should be inserted
in the form of the Exhibit attached hereto and marked
Exhibit "B" and then and when that has been done, a
like and equal amount must be inserted in said form
as liquidated damage in line 2 near the bottom of
said Exhibit "B". The Court finds and determines
that liquidated damages are required and are not a
matter of discretion because the State of Montana has
not shown any good faith in failing to pay these Plain-
tiffs for their overtime work. On the contrary, the
Court finds that the State of Montana chose to ignore
and did ignore the statement or advice given by Mr.
Donald Drew, Field Office Supervisor, United States
Department of Labor, Wage and Hour and Public Contracts
Division of Salt Lake City, Utah, dated March 7, 1967,
which specifically advised that the 'Act would apply
to all employees' of Montana Children's Center. The
ignoring and disregarding of this advice and the failure
by the State and the Department of Institutions to do
anything further until February 1, 1969, is an indica-
tion of positive lack of good faith and shows an eva-
siveness which in its effect, constitutes bad faith in
not paying these Plaintiffs at the Childrens' Center
for their overtime work. Additionally, the Court finds
that payments made by the Defendant on an eight-hour
day and 40-hour week to employees at Pine Hills School
and Mountain View School, would also indicate a positive
lack of good faith and evasiveness and indeed bad faith
in not paying these Plaintiffs at the Childrens' Center
for their overtime work."

Historically the Fair Labor Standards Act had no application to a state children's home. In 1966 Congress amended the Fair Labor Standards Act (29 U.S.C. § 203(s)(4)) to include the operation of an elementary or secondary school whether or not operated for profit. The amendment became effective February 1, 1967. The record here indicates that at about that time Mr. Gooch, Personnel Director of the Department of Institutions, began making inquiries of the federal wage and hour office, located in Salt Lake City, Utah, to ascertain whether the personnel at the Montana Children's Center came under the Fair Labor Standards Act. Several telephone calls were made to the federal office but the question raised was not resolved nor did Mr. Gooch get a definite answer. He testified:

"Q. As a result of your contact with the Federal Wage and Hour officials, did you receive a definite answer as to whether or not the Montana Children's Center was covered by the Fair Labor Standards Act? A. No, I did not.

"Q. Did a question arise subsequent to this conversation concerning the application of the Fair Labor Standards Act to the Montana Children's Center? A. Yes.

"Q. Approximately when did the question arise to the best of your recollection and memory? A. It was a continual question from the time that the Fair Labor Standards Act first came to our attention.

"Q. All right, what action subsequent to your initial contact with the federal officials was taken to resolve the question one way or another? A. Several telephone conversations to Salt Lake City, where the Fair Labor Standards people are based.

"Q. And was the matter ever finally resolved? A. It never was resolved. They could not give me definite information.

"Q. Were any meetings held, excuse me, did you ever meet with representatives of the Wage and Hour Division? A. We had requested meetings but none were held until December of '68.

"Q. And where was that meeting held? A. It was held here in Helena, or rather in Helena in the museum building.

"Q. And who attended that meeting? A. We invited superintendents as a department to attend the meeting, the Labor Commissioner's office was in attendance, the University System was invited, the Budget Office, other State people who would be concerned with implementation of the Wage and Hour provision.

"Q. And when was this meeting held again, the date, the approximate date, at least by month? A. To the best of my recollection it was in the latter half of December of 1968.

"Q. Now at this meeting in late December, were representatives from the Wage and Hour Division of the Department of Labor in attendance? A. Yes, Mr. Donald Drew was in attendance.

"Q. Were any representatives of the Governor's office in attendance? A. I don't recall.

"Q. What was the result of this meeting? A. I don't know if I could comment on the result. Well, I guess I could. The result of the meeting was to advise us, let me say the meeting was held to advise us of wage and hour provisions and their application, and the result of the advisement was that they were instructed at that time that definitely the Children's Center would be a covered agency.

"Q. This was in late December, 1968? A. Yes, sir.

"Q. Was this the first knowledge that you yourself, and to the best of your recollection the Department of Institutions had that the Montana Children's Center was covered by the Fair Labor Standards Act?"

At this point there was considerable discussion as to whether or not this was the first knowledge, timewise, of this coverage, but the following testimony was later brought out in direct examination:

"Q. Generally does the Board of Institutions, through the Director, require you to handle personnel matters relating to State institutions as part of your job as Personnel Director? A. Yes, they do.

"Q. During the period in question, February 1, '67, through January 31, '69, were you the representative of the Board at all proceedings concerning the wage and hour applications of the Fair Labor Standards Act to the various State institutions? A. Yes, I was.

"Q. And during any of these meetings when you acted as a representative of the Board of Institutions prior to the meeting of December, '68, were you ever advised as Personnel Director that the Montana Children's Center was covered by the provisions of the Fair Labor Standards Act? A. No, I was never so advised.

"Q. Did you communicate with the Governor's office subsequent to the meeting held in December, '68, concerning application of the Fair Labor Standards Act? A. Yes, we did.

"Q. You heard the testimony of Mr. Balkovatz in the introduction into evidence of Executive Order 1-69 stating that it has been called to the attention of the Governor that the employees of the Montana Children's Center at Twin Bridges were not in compliance with federal wage hour legislation and federal law requires

the institution to be in compliance no later than February 1st, 1969, are you familiar with that Executive Order? A. Yes, I am.

"Q. As a result of that Executive Order, to the best of your knowledge did the Montana Children's Center come into compliance with the provisions of the Fair Labor Standards Act? A. Yes, they did."

Some emphasis is made by plaintiffs directed to the letter of Mr. Gooch, dated March 3, 1967, several months after the Act became effective, to a Mr. Donald Drew, the administrator of the Act in this area, wherein he asked:

"SITUATION   The law specifies 'Educational Institutions' are included as covered agencies. We have an institution that has the primary objective of caring for dependent and neglected children, however, encompassed within this institution's program is education on the elementary and secondary level.

"QUESTION: Would that portion of the institution that is involved in the education process be considered as being subject to the act? If so, would it include such positions that are not directly involved in the teaching process, but supportive thereof, such as clerks, janitors, etc.

"We will appreciate your consideration of this request."

Plaintiffs' Exhibit "7" shows that on March 7, 1967, an answer was received from Mr. Drew, which said:

"If the educational program does constitute an elementary and secondary school as determined under State law, that Act would apply to all employees of the units. Lacking full details on the program in question, I cannot render an opinion. If you wish to submit further information, I will give the matter additional consideration."

The record indicates, and Mr. Gooch testified, that he understood the word "units" to mean educational units located at the Center and that until Executive Order 1-69, the Act did not apply to the entire personnel of the institution. Personnel within the educational program were put under the Act.

These are not facts indicating a lack of good faith, much less do they indicate as the trial court found, a "positive lack of good faith and shows an evasiveness which in its effect, constitutes bad faith."

In our opinion the test for a determination of what constitutes good faith is found in Snelling v. O.K. Service Garage, Inc., (E.D.Ky. 1970), 311 F.Supp. 842, 846, where the court stated:

> "Left for determination is whether the plaintiffs are entitled to liquidated damages as provided for in section 16 of the Act. This is a fact question and must be decided according to the reasonableness of the defendant's decision not to pay minimum and overtime compensation. If the defendant in good faith reasonably believed the Act did not apply to his employees then liquidated damages should be refused. The liquidated damage provision of the Act provides a mechanism whereby plaintiffs can be compensated for the withholding of a minimum wage which may have resulted in intangible damages concomitant with substandard living situations. Theoretically liquidated damages are compensatory, but whatever label is attached to such an award it cannot be gainsaid that it is a severe sanction. Prior to the Portal-to-Portal Act of 1947, 29 U.S.C. section 260, liquidated damages were deemed to be mandatory in all minimum and overtime compensation cases. [Cases cited] It became apparent, however, that such an onerous rule created wholly unexpected liabilities which threatened employers with financial ruin and encouraged champertous suits involving employees who hoped to acquire a windfall. Accordingly Congress enacted the Portal-to-Portal Act of 1947 which authorized courts not to award liquidated damages where it appeared the employer had acted in good faith. Liquidated damages should only be granted where an oppressive employer, well knowing it has no defense to the application of the Fair Labor Standards Act, stubbornly refuses to comply with it. The facts of this case are not so clear cut that the defendant could not sincerely believe he was exempt."

For cases citing examples of good faith see: Retail Store Emp. Loc.400 v. Drug Fair-Community Drug Co., 307 F.Supp. 473 (D.C. 1969); Martinez v. Phillips Petroleum Co., 283 F.Supp. 514 (Idaho 1968); Crago v. Rockwell Mfg. Co., 301 F.Supp. 743 (Penn. 1969); Hodgson v. Daisy Mfg. Co., 317 F.Supp. 538, 554, (Ark. 1970).

In Hodgson, the court speaking on the issue of good faith said:

> "This action primarily involved an issue of law which was novel at the time the suit was commenced, in 1965, and concerning which this court has only recently been provided with binding precedent. The Third Circuit Court of Appeals * * * and more recently the Eighth Circuit Court of Appeals * * * have construed the word 'equal' as used in the Act, to mean 'substantially equal' as opposed to 'substantially identical.' This construction of one of the essential elements of the Act is contrary to the meaning which might in good

faith be inferred by an employer from a fair reading of the legislative history of the statute * * *. The fact that the law as it applied to the defendant was unsettled for almost all of the five years this suit has been pending is clearly a factor bearing on the question of good faith. [Citing case] Few employers could satisfy a test of good faith if required to correctly anticipate judicial precedent."

Plaintiffs' counsel admits this is a novel issue of law, one of first impression, and to hold defendant guilty of bad faith is a manifest abuse of the trial court's discretion.

Defendant's final issue on appeal directs itself to the award of attorney fees.

Congress in 29 U.S.C. Sec. 216(b), provided:

"The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Here, counsel had a contingent fee contract arrangement with all plaintiffs that provided, according to counsel's testimony:

"The Montana schedule adopted by the Bar Association for contingent fee arrangements is 25% of a contingent fee on the settlement; 33 1/3 after suit is brought if settled; 40% if tried; and 50% if the matter goes to the Supreme Court. Now this has already been to the Supreme Court, and for all I know it will go again. We do not ask for more than 40%, but we do ask for that 40%. We ask for it under the Fair Labor Standards Act, which specifically provides for the allowance of attorney fees in the discretion of the Court and those attorney fees to be paid by the State. As I said in my opening statement to the Court I am not seeking and do not seek a duplication in fees; but to the extent that the Court will impose upon the State of Montana the obligation to pay attorneys fees, to that extent the fees we will charge directly to each Plaintiff will be correspondingly reduced."

The trial court went the entire distance with counsel's request; it awarded 40% for attorney fees, amounting to approximately $140,000.

In view of our remand for modification of the amount of the award to plaintiffs herein, the award of attorney fees must likewise be set aside and remanded for modification. In this connection, we note the Fair Labor Standards Act provides for an award of "a reasonable attorney's fee to be paid by defendant".

In awarding attorney fees the district court is not bound to award attorney fees on the basis of the provisions of the contingent fee agreement between plaintiffs and their attorneys, but is entitled to consider this as one of the factors to be considered in determining "a reasonable attorney's fee" under the Fair Labor Standards Act. We remand to the district court for that determination accordingly.

The cause is remanded to the trial court for action not inconsistent with this opinion.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____
Associate Justices.

Mr. Justice Wesley Castles concurring in part and dissenting in part:

I concur in part of the majority opinion but dissent to the Court's determination of Issue No. 2, that is as to the rate of pay. There is nothing "novel" about the question. The plaintiffs' rate of pay was the weekly wage divided by the hours worked. That was the agreement; the only change came about by operation of law. I would reverse the district court on that item too.

_____
Associate Justice.

- 13 -