James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

SAGNER, INC., and Local Union 604, Amalgamated Clothing Workers of America, AFL–CIO, and Baltimore Regional Joint Board, Amalgamated Clothing Workers of America, AFL–CIO, Defendants.

Civ. No. 19906.

United States District Court, D. Maryland.

April 8, 1971.

Louis Weiner, Deputy Solicitor, and Marshall H. Harris, Deputy Regional Solicitor, Philadelphia, Pa., for plaintiff.

Jacob Blum and Blum, Yumkas & Mailman, Baltimore, Md., for defendant Sagner, Inc.

Bernard W. Rubenstein and Edelman, Levin, Levy & Rubenstein, Baltimore, Md., for defendants Local 604 and Baltimore Regional Joint Bd., Amalgamated Clothing Workers of America, AFL–CIO.

## MEMORANDUM OPINION

HARVEY, District Judge.

In this civil action, the Secretary of Labor is seeking an injunction against a clothing manufacturer and the union that represents its employees, seeking to restrain the defendants from violating the Equal Pay Act, and seeking further to restrain the withholding of certain unpaid back wages. The corporate defendant, Sagner, Inc. (the "Company"), manufactures men's clothing at its Frederick, Maryland, plant. The defendant Baltimore Regional Joint Board, Amalgamated Clothing Workers of America, AFL–CIO (the "Union") is the union which represents employees of Sagner. The other defendant Local 604, an affiliate of the Baltimore Regional Joint Board, is in effect not a separate entity, and its liability need not therefore be considered separately from that of the Joint Board.

The Secretary of Labor first contends in this action that the corporate defendant violated certain provisions of the Equal Pay Act, which was enacted by Congress in 1963 and which added certain sections to the Fair Labor Standards Act. The statutory provisions specifically involved here are codified as 29 U.S.C. § 206(d). In essence, this statute makes it unlawful for an employer to discriminate on the basis of sex as to the payment of wages and further makes it unlawful for a union to cause such discrimination.

It is claimed by the Government that for a two-year period, from March 14, 1966 to March 14, 1968, the Company paid female cutters and female markers 40 cents per hour less than male cutters and markers. Fifteen female cutters and seven female markers are involved during the period in question. The Government claims that the amount of the underpayment for the entire period comes to $29,771.36, but since $7,442.84 (or one-quarter of this amount) was paid by the Company to these female cutters and markers in 1968, the amount claimed to be due in this action is $22,328.52, plus interest.

Insofar as the defendant Union is concerned, the Government originally sought in its amended complaint merely an injunction on the grounds that the Union was jointly liable with the defendant Sagner because it caused the Company to discriminate against female employees in violation of 29 U.S.C. Section 206(d) (2). Section 206(d), after providing in sub-section (1) that no employer shall discriminate between employees on the basis of sex by paying lesser wages to one group than those paid to another group of employees of the opposite sex, provides in subsection (2) as follows:

"No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this sub-section."

At the trial, the Government moved under Rule 15 of the Federal Rules of Civil Procedure to amend its pleadings to conform to the evidence so as to include also a claim for damages against the defendant Union. After hearing argument, the Court granted the motion at the conclusion of the Government's case. Accordingly, an injunction and damages are sought as to both defendants.

The purpose of the Equal Pay Act was to correct discriminatory wage practices which Congress found had a burdensome effect on the living standards of workers and accordingly on the national economy. Under the statute, employers are required to pay equal

amounts to their employees without regard to considerations of sex, so long as substantially equal work is being performed by the male and by the female employees involved. The first question before the Court then is whether during the period covered by this suit the female cutters and markers were performing work substantially equal to that being performed by the male cutters and markers.

In final argument, both the Company and the Union conceded that substantially equal work was being performed by both male and female employees involved and that the Company should have paid its female cutters and markers at the same hourly rate as it paid its male cutters and markers during the 2-year period after March 14, 1966. Indeed, the facts developed at the trial clearly show that the work done by the female cutters and markers was substantially equal to that done by the male employees similarly classified and that there was no valid reason for the differential in pay, other than the sex of the employees involved.

But this preliminary finding does not resolve the other questions presented in this case. The Company argues that it should not be held responsible for these payments due the female employees in question because the Union caused the discrimination. The Union argues, on its part, first that under the Act it cannot be compelled to pay back wages which have been withheld by the Company; and, second, that the facts here do not, in any event, establish that it caused the discrimination in question.

Taking up first the question of law raised by the Union, this Court must determine preliminarily whether, under the Act, a union which has caused a company to discriminate on the basis of sex can be held liable in damages for the payment of the wages illegally withheld. The Union here points out that the statute empowers the Court to restrain the withholding of payments found by the Court to be due employees, but argues that since a union cannot be said to

withhold payments due a company's employees, the only relief that the Court can grant against a union is prospective injunctive relief. In support of its argument, the Union relies on the cases of Wirtz v. Hayes Industries, Inc., 18 W.H. Cases 590 (N.D.Ohio 1968).

■ After reviewing that decision and considering the arguments advanced, this Court cannot agree with the Union's position, particularly under the facts of this case. If that position were correct, a union which had caused an employer to illegally withhold wages from its employees would be subject to no more than future restraint. Its past violation of the law would go uncorrected and unpunished; it could merely be prevented from breaking the law in the future. There is no apparent reason why a union which violates Section 206(d) should be treated any differently from an employer violator. Equitably, both should be subject to the same type of decree, which in order to give full relief would necessarily include a provision requiring the payment of wages illegally withheld or caused to be withheld as well as one prohibiting any future violation of the law.

Whether or not there is an express statutory basis for the ordering of this type of relief against the Union, this Court is satisfied that within its general equitable powers, it may, if it finds a violation of Section 206(d) (2), order an offending union to repay to the Government for distribution to the employees involved the wages that the Union caused to be wrongfully withheld. In support of this proposition, I would cite the case of Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). Any other result would not permit the enforcement of the Act by the Court in a manner consistent with the Congressional intention.

In the *Hayes* case, the language which is relied upon by the Union is pure dictum. The Government in the *Hayes* case had not sued the union and did not seek damages from the union. The

Court found in connection with the third party claim being there asserted that the union had not caused the employer to establish the wage differential in question. Here, the Government relies on substantially different facts, and there is a direct claim against the Union. As to the Union, the Government argues that the Company was prepared to pay the entire amount of back wages due but that the Union bargained away the rights of the 22 employees involved in favor of some 100 other employees who were not due any back wages under the Act. Certainly, under facts such as those claimed to be present in this case, the Union, if indeed it did violate the Act, should not escape responsibility for making payment to the 22 employees involved who were denied their back wages allegedly because of union action.

In view of this Court's conclusion as to the law, the questions that remain to be resolved under the facts here, in addition to the question of prospective injunctive relief, are as follows:

1. Whether the Company alone is liable for the remaining amounts of back wages due;

2. Whether the Union alone is so liable;

3. Whether neither the Company nor the Union is so liable; and

4. Whether both the Company and the Union are so liable jointly and severally.

After hearing the evidence and reviewing the exhibits and the pleadings, this Court concludes that the Secretary of Labor is entitled to an injunction against both the Company and the Union and is further entitled to recover the full damages claimed from both of the defendants, jointly and severally.

For a full understanding of the facts which compel this conclusion, it is necessary to recount the events that transpired between October 30, 1967 and March 14, 1968, and in particular the details of the negotiations between the Company and the Union that took place during that period. On the former date,

October 30, 1967, Mr. Sam Nocella, Manager of the Joint Board, wrote the Company and suggested that the Company was violating the Equal Pay Act. (Parenthetically, it should be noted that he called the statute in his letter "the Civil Rights Act" but it is clear from his testimony that he was actually referring to the Equal Pay Act, the statute which forms the basis for this suit.)

Meetings were thereupon arranged with Company officials to discuss this question. At the first meeting, the Company denied that it owed any amounts to female employees under the statute. Altogether, some five meetings were held between Company and Union representatives, including their attorneys, and as the negotiations proceeded, the Company's position changed from time to time. At one of the earlier meetings, it recognized its liability under the Equal Pay Act and stated that it was willing to pay one full year of wages to the female employees involved. At this stage in the negotiations, both the Company and the Union were in agreement that the Act had been violated and that substantial sums were owed to the 22 female cutters and markers in question. It was therefore incumbent on both parties at this stage to see that the amounts were properly computed and that all the amounts due under the law were paid to the 22 employees involved. Neither party fulfilled such duty. The Company, although realizing that under the law back wages were due, eventually paid only one-quarter of the total sum due. The Union, with a similar realization, proposed to the Company (and it is clear from the evidence that this was the Union's idea, not the Company's) that parts of the amounts due as back wages be paid to *other* employees.

The Union, from the outset, was not satisfied with merely the payment of the sums due the 22 female cutters and markers. The Union claimed during the negotiations that others in the cutting room would be dissatisfied and that there would be "problems" if only the 22 female employees received the payments.

The Union argued that in addition, amounts should be paid to these other employees to avoid these "problems." The Company refused to go along with this proposal and insisted (shortly before agreement was reached) that it would pay no more than amounts due these female employees covered by the Act. As mentioned, it was the Union that initially proposed that only a part of the amounts calculated to be due to the 22 female cutters and markers be paid to those employees, with the remainder being distributed among the other employees in the cutting room as a. wage increase until the end of the contract year.

Further negotiations ensued, and finally the Union's suggestion was accepted by Mr. Sagner, contrary to his attorney's advice. One-quarter of the amount legally due was paid by agreement to the 22 female cutters and markers. The remaining three-quarters was to be paid to the other 100-odd employees in the cutting room as a wage increase until the end of the current contract year.

These facts lead to the following conclusions:

1. That the Company did not relieve itself of the legal liability it had (and recognized) to the 22 female cutters and markers by entering into this agreement with the Union; and

2. That the Union caused the Company to discriminate against such female employees by inducing the Company to divert substantial sums due such employees and pay such sums to employees who were not then legally entitled to them.

I find that before the final agreement was reached between Mr. Nocella and Mr. Sagner, the Company was prepared to pay the full two years back pay to the female employees to whom it was due. The Union's refusal to agree to this proposal of the Company prevented such payment.

 When the Company entered into the agreement proposed by the Un-

ion, it did so at its own risk. Indeed, the Company's experienced counsel advised that if all of the money were not paid to the 22 female cutters and markers, the Company might well have to pay certain sums twice. This was sound advice. Yet the Company's management chose to disregard it and ignore the clear legal obligation it had to make full retroactive payments to the employees entitled to them. Under the Fair Labor Standards Act, no agreement between a company and a union, even if arrived at as a result of collective bargaining negotiations, can be used as a defense by a company to the statutory requirements. See in this connection a number of cases that arose under other provisions of the Act: Johnson v. Dierks Lumber and Coal Co., 130 F.2d 115 (8th Cir. 1942); McNorrill v. Gibbs, 45 F.Supp. 363 (E.D.S.C.1942); and Tennessee Coal, Iron and R. Co. v. Muscoda Local No. 123, 137 F.2d 176 (5th Cir. 1943), affirmed 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944). This agreement then, reached in March, 1968, did not relieve the Company of its obligation to pay these female employees the full amount due them.

The Union's actions are even more difficult to comprehend. After recognizing the Company's obligations under the law to the female cutters and markers—even ·calling the Company's attention initially to the requirements of the law—the Union then went ahead and bargained such obligations away in favor of other employees in the cutting room. The Company owed nothing to those other employees, either under the law or under the existing collective bargaining agreement which did not expire until June 1, 1968. Yet it was the Union which suggested that the Company pay 75% of the amount legally due to these female cutters and markers to other employees not entitled to these sums by law or contract. Clearly, the Union violated the statute by insisting that the Company discriminate by not paying the female employees in question the full amount due them.

That the Union was well aware that its actions were legally questionable is indicated by what it did after agreement was reached. The Union sought to protect itself by means of presenting written waivers to the 22 female cutters and markers, whereby they purportedly surrendered their legal rights to the back pay due them. I find from the evidence that this device was the Union's idea, that it was carried out by the Union and that it was designed to protect the Union. I reject the testimony of Mr. Nocella that Mr. Blum asked for these waivers. Indeed, I found very little of Mr. Nocella's testimony worthy of belief. From the testimony of Mrs. Baron, Mr. Blum and the female cutters and markers, I find that the waivers were secured by the Union for the Union.

These waivers in no way go to prove that the Union did not cause the Company to discriminate against the female employees in question. On the contrary, they are further proof of the Union's intent to violate the law, representing attempts by the Union to cover up the blatant manner in which it bargained away the legal rights of 22 union members in favor of windfall benefits conferred on 100 other union members. Perhaps the numbers involved in each respective group had something to do with the Union's actions here.

The Union argues that at one point in late January, 1968, the Company was willing to accept an agreement whereby 50% of one year's back pay would be paid to the female cutters and markers and the other 50% would be paid to the other employees in the cutting room. This may have been so, but it is without legal significance. Negotiations had commenced in November, 1967, and the Company's position had changed several times before the January meeting, in view of the Union's insistence that something be paid to the other employees.

This Court finds that such Company proposal was not acceptable to the Union in late January and that the Company then withdrew it and offered to pay, as required by law, the full two years' back pay to the 22 employees involved with nothing going to the other employees. This was the final Company position before the compromise agreement was reached in late February, 1968, between Mr. Sagner and Mr. Nocella.

The Union further claims that the final agreement was 50% to the female employees and the other 50% to the other employees by way of a 20 cents an hour increase until June 1, 1968. The credible evidence does not support this position. Mr. Nocella, himself, when he first testified on the second day of the trial, stated that the agreement was a 25%–75% agreement, with 18 cents an hour being paid to the other employees. The following day he took the stand and changed his testimony. The $7442.84 actually paid in 1968 is precisely one-quarter of the amount which the Company books show was due these female employees during the two years involved. But, more importantly, the releases, prepared by the Union or its attorneys, state clearly that two years back wages were due but that only six months (or one-quarter) were being paid.

Finally, the Union argues that the full $22,328.52 agreed upon was never paid to the other employees, but only some $11,000 up until June 1, 1968. It is certainly curious that the Union never raised any question until apparently mid-way in the trial concerning Company payments under the agreement. But in any event, this fact likewise is without legal significance. For the purposes of this case, it is not material that the Company may not have carried out its part of the illegal bargain, insofar as the other cutting room employees were concerned. The clear fact that emerges in any event is that the Company offered to and presumably would have paid the full 2-year sum to the female cutters and markers had the Union not insisted that the other employees receive a share of this sum. Furthermore, in view of this finding, the Union is not entitled to an offset in the amount of $11,000. The Union caused the entire

amount not to be paid by the Company. The Company, for reasons of expediency, went along with the Union's proposal. The liability is therefore joint and several as to the entire amount claimed by the Government.

■ Finally, I am satisfied that an injunction should be entered against both defendants prohibiting future violations of the Act. Even though the Company is apparently now in compliance, I am satisfied from the evidence that for the protection of the employees involved an injunction should be entered prohibiting both the Company and the Union from acting in the future so as to violate the Act.

So, for these reasons, I will enter a decree enjoining the defendants in the manner stated and further requiring that payments in the amount of $22,-328.52 be made by them, plus interest and costs.