Peter J. BRENNAN, Secretary of Labor, successor to James D. Hodgson, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

BOARD OF EDUCATION, JERSEY CITY, NEW JERSEY, et al., Defendants.

Civ. A. No. 1795–71.

United States District Court, D. New Jersey.

April 19, 1974.

Francis V. La Ruffa, New York City, Regional Solicitor U. S. Dept. of Labor, by Jay S. Berke, Jay A. Litwin, for plaintiff.

William A. Massa, of counsel, Jersey City Board of Education, Jersey City, N.J., by George R. Blaney, Jersey City, N.J., for defendants.

## OPINION

LACEY, District Judge:

This is one of some 22 suits, all assigned to this court, which have been instituted by the Secretary of Labor against various Boards of Education of this State under the Equal Pay Act provisions of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.). Plaintiff alleges in his several complaints that the said Boards have, for varying periods, violated §§ 6(d)(1) and 15(a)(2) of the Equal Pay Act [29 U.S.C. §§ 206(d)(1) and 215(a)(2)], by paying their female custodial employees salaries and at rates less than they pay their male custodial workers for equal work on jobs the performance of which require equal skill, effort and responsibility, and which were and are performed under similar working conditions.

At a Pre-Trial Conference attended by plaintiff's counsel and counsel for the several Boards of Education, this court suggested that the first of these cases to be tried be one embodying fact and law questions common to most if not all of the remaining cases. Counsel agreed and, accordingly, the instant matter was designated as the pilot case; however, from this it is not to be taken that the other Boards of Education have agreed to be bound by the determination herein.

On March 11, 1974, a further Pre-Trial Conference was conducted, this time attended by counsel for the parties herein. The court at that time expressed the notion that its experience in handling the entire complex of these cases had led it to believe that factually there was little difference between the parties; that much historical and narra-

tive data could be stipulated; and that, of the total testimony which would be adduced by the approximately 50 witnesses anticipated, only a small portion thereof, if any, would give rise to serious dispute. It was then and now the court's view that the parties were at odds essentially only as to the interpretation of the evidence which would be offered, and the inferences to be drawn therefrom under pertinent legal principles.

Accordingly the court suggested that this non-jury case be tried by deposition de bene esse, the depositions to be taken out of the court's presence on a daily copy basis in the federal court house, with counsel free to apply to the court at any time for instant rulings as the need therefor arose. The court stated it would read daily the testimony transcribed, and would hear testimony of any witness at the request of either counsel. As the Pre-Trial Order of March 18, 1974 sets forth, counsel agreed to this innovative approach. *See also*, Minutes of Pre-Trial Conference, March 18, 1974, reflecting agreement upon the foregoing procedure.[1]

Trial as thus defined then commenced on March 18, 1974. Plaintiff called 36 witnesses on March 18, 19 and 20, and rested. On March 21 the court heard and denied defendant's motion for dismissal under Fed.R.Civ.P. 41(b) and, thereafter, defendant presented its case on March 21 and 22, and rested.[2] Posttrial briefs and/or Proposed Findings of Fact and Conclusions of Law were exchanged on April 8, 1974, with each side's reply filed and served on April 11, 1974. On April 15, 1974 the court heard final argument.

Based upon its careful consideration of the foregoing, the court hereinafter sets forth its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. This action was instituted by the Secretary of Labor under 29 U.S.C. § 217 of the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) (the Act) to enjoin the defendant Board of Education (the Board) from violating the Equal Pay provisions of the Act [29 U.S.C. §§ 206(d)(1) and 215(a)(2)] and to restrain the withholding of back wages resulting from such illegal pay differentials as the court might find to be due employees, together with interest thereon. Plaintiff charges that the Board has been and is violating the Act by paying higher salaries to male custodial workers than it pays to female custodial maids.

2. The Board's initial defense of immunity under the Eleventh Amendment as "a political subdivision of the state" was stricken from its answer by this court's order of June 28, 1972 pursuant to opinions filed in this matter on June 14 and June 20 of 1972. At that time defendant's motion for summary judgment, consolidated with motions of several other New Jersey Boards of Education, faced with similar Equal Pay litigation, was also denied. *See* 344 F. Supp. 79 (D.N.J.1972), app. dismissed, 468 F.2d 1325 (3d Cir. 1972).

3. The complaint, filed December 1, 1971, originally named the Board's President and Secretary as codefendants, but the plaintiff, upon the Board's admission that it is an employer within the meaning of § 3(d) of the Act [29 U.S.C. § 203(d)] with respect to all affected employees, agreed to dismiss the action against the individual defendants. The parties further agreed, however, that no legal conclusion regarding the liabili-

---

1. *See* 2-4.

2. In all 51 witnesses were called, covering 1157 pages of transcript. As the record reflects, counsel performed most professionally, in a highly creditable fashion, and did not require the court's presence to resolve any issues. As will hereinafter be reflected, this court is not confronted with any substantial issues of credibility of witnesses. Instead, to be resolved is, taking the testimony as substantially accurate, was the Equal Pay Act violated?

ty of any official of a Board of Education for back wages resulting from violations of the Act, in any other action, is to be drawn from this dismissal. The Pre-Trial Order of March 11, 1974, at ¶ VI(d), provides for said dismissal.

4. The Board admits that it is an educational enterprise covered by § 3(r) and 3(s)(4) [29 U.S.C. § 203(r) and (s)(4)] of the Act in that it operates public day elementary and secondary schools as defined in § 203(v) and (w) under common control and unified operation which perform the related activities of providing elementary and secondary education to students of the City of Jersey City. These activities are by § 3(r) "deemed to be activities performed for a common business purpose." The Board admits that it, under § 3(s), "has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce . . . ." [Pre-Trial Order, ¶ VI(c)]

5. The Board operates 35 public schools, including 4 high schools, 31 elementary schools, and an administration building. (Ex. 2) All buildings are within the City of Jersey City. Many are close to one another; the Administration Building is on the same grounds with Lincoln High School. Other schools also have nearby but separate annex buildings. Individual schools may be a few miles apart, or as close as within one block from one another.

6. Purchasing of materials, and maintenance services, are handled through the defendant's central administration. The Board employs a central force of mechanics and workmen, including carpenters, plumbers, painters, electricians, plasterers, and laborers. They are responsible for repair work at all the Board's buildings. A separate official, working out of the Board's Administration Building, coordinates this maintenance staff and each school's custodial staff. He visits the different buildings, deals with complaints, and sees that necessary work is performed.

7. Cleaning at each school is performed by the custodial staff, consisting of a head custodian, one or more engineers, male custodial workers, and female custodial maids. Generally these employees are assigned to and work at one school, but may be transferred as the Board deems necessary. To determine the number of custodial employees required for a school, the Board assumes that each male custodial worker and each custodial maid cleans the same amount of space in all its buildings, about 12,000 square feet. Many people have performed work at more than one school during their tenure, and the period here involved. The Board views each custodial worker and custodial maid as working within one integrated school system, which constitutes a distinct facility or place of business. The janitorial staff performs similar work from school to school. The workers are hired and initially assigned to schools by the Board's Superintendent of Buildings and Management. Major complaints regarding their work, or requests for transfers, are referred by individual school principals to the Building Superintendent. All custodial workers and custodial maids are paid pursuant to the Board pay schedules and there is no differentiation in pay based upon the building in which these employees perform their services. Additionally, the members of the custodial staff usually work an 8-hour day with paid time off for lunch or dinner (Ex. 2). At some schools the staff works on two or more shifts with the night shift ending at 10 p. m. or midnight. Male custodial workers and female custodial maids are employed on both the day and night shifts. The Board makes no distinction in pay between custodial employees on the day and night shift. (Ex. 1)

8. For the pertinent period, the Board pay schedules, related to the prevailing collective bargaining agreement, reflect the payment of a higher base salary to custodial workers, an all-male class, than to custodial maids, an all-fe-

male category.[3] Thus, in 1968 the starting salary for maids was $4,104 per year as against $4,309 for custodial workers, a difference of $205. That differential has risen since 1968, and the current pay schedule for 1974 reflects starting pay for custodial workers $410 per year higher than that for building service workers, the new name of the female category formerly designated custodial maids. The schedules for all years further show that the males get a yearly increment of $205, the females $195 per year. The initial difference in pay between the sexes thus increases as employees gain seniority. (Ex. 1)

9. The Board pay schedules provide for higher salaries for other all-male classes such as head custodian, firemen, or employees of the central maintenance groups. (Ex. 1) However, male-female wage and work comparisons are made herein solely between the custodial maids (now building service workers) and the custodial workers.

10. The Board admits the above differential favoring custodial workers as against custodial maids [Pre-Trial Order, ¶ VI(f)], but contends that jobs performed by individuals in those two categories are not substantially equal under the law. The Board claims that men perform certain additional duties not performed by women, including cleaning stairwells and corridors, sweeping and picking up papers outdoors, cutting grass and shrubs, shoveling snow, operating buffing machines, receiving deliveries, moving furniture, carrying five gallon water cooler jugs, screwing in lightbulbs, climbing ladders, and acting as watchmen. The Board claims that these extra duties are valid factors "other than sex" which justify the pay differential under 29 U.S.C. § 206 (d)(1)(IV). [Pre-Trial Order, ¶ III] The Board also claims that its adherence to state Civil Service laws and collective bargaining agreements with the union representing its employees justify the alleged violations.

11. The primary function of male custodial workers and female custodial maids is to clean. (Tr. 125, 456, 969) [4] Each maid has her own assigned areas to do on a daily basis. In each classroom or office the women must sweep the floor, often moving students' desks and chairs, or teachers' furniture. They wet mop the classroom floors, dust the furniture and wash down the desk tops to remove ink marks and other dirt. They also wash the glass inside of the doors to each room and the water fountains out in the halls. They clean in some higher places like the upper surface of cabinets, the tops of lockers, and the upper woodwork or panes on a door, so they sometimes stand on chairs or step ladders to accomplish their work. They usually carry a pail of water, a mop, a broom, cloths, and cans of soap with them on their rounds. When these supplies run out, the women go downstairs and carry what they need to do their work area. They also have a large plastic garbage can or refuse bag which they may push on wheels, drag, or carry from room to room. They empty garbage from each basket into the larger container and carry it down or take it by elevator to the dumping area.

In the bathrooms the women must wet wash the floors and scrub down the toilets, urinals, sinks and walls, a job which must often be done more than once a day per lavatory. They are also assigned to corridors and stairwells, and as part of their regular duty, must sweep these areas daily, with wet mopping as necessary. The women also work in teams, each for example taking a section of an auditorium, wiping down chairs, sweeping floors and dusting

---

3. Art. 21 of the Agreement provides: "The employer agrees that there shall be no discrimination or favoritism for reasons of sex . . . . " The union is Local 1959, American Federation of State, County and Municipal Employees, AFL–CIO.

4. Critical findings, to a great extent, will be followed by supporting transcript references to assist counsel and any appellate court.

walls and woodwork, and periodically they wet mop the stage area. In addition, throughout the day, the women are available for and may respond to a number of emergencies, like cleaning up broken glass from windows, or mopping after pupil sickness.

12. Most male custodial workers, like the females, have regular cleaning assignments and the areas to which they are assigned, and the duties they perform, are the same as those set forth for the maids above. (Tr. 52-54, 87, 111, 122, 126, 127, 141, 169, 190, 193-196, 252, 278, 355-359, 433, 455, 795, 811) In a few schools the same work is split between them. Thus females may be assigned to clean only the classrooms, offices and bathrooms, while the males clean mainly the stairwells and hallways. (Tr. 42, 43, 127, 410, 597-598, 665, 849, 870) However, the total area cleaned by each employee is about the same size (Tr. 712-716, 831, Ex. 6), and, as stated, this cleaning involves for both males and females the same dusting, mopping, sweeping, washing and scrubbing. (Tr. 59, 87, 88, 169, 211, 252, 363, 367, 407, 818)

13. In a few schools, the manner in which men and women handle trash varies slightly from 11, *supra,* but not substantially. Thus the maids may put trash into plastic bags which are left at the elevator for a man to take downstairs. A custodial worker that day, or the following morning, will carry the garbage out to the curb or dumping area. At least one woman, at Ferris High School, regularly took out the garbage as well, with no increase in pay. (Tr. 342, 350) Most of the school buildings also have incinerators but they have not been in use for years, in some cases, not since August 1969. When incinerators were in operation, not all custodial workers used them, since the firemen usually burned the garbage.

14. Although the Board claims that male custodial workers regularly function as watchmen, the testimony is otherwise. (Tr. 61, 82, 92, 136, 356, 419, 979) Indeed, the Board employs a separate category of "watchmen" and "security guards" (including females) at some of its schools. (Tr. 35, 61, 173, 384, 700, 948, 1017, 1018, Ex. 1) It is noted that adults in a school building naturally serve a security function and both the custodial maids and custodial workers are therefore incidentally involved in deterring and reporting incidents of vandalism or rowdiness in the locker rooms, bathrooms and hallways. (Tr. 34, 173, 344, 384, 431, 432, 903)

15. The only area cleaned by men and not women is outdoors: the sidewalks, school yards, and building entrances. However, some men, such as those on the night shift, do no outdoor work regularly. (Tr. 67, 68, 91-92, 360) As to those who do, their regular outdoor duties are not substantially different from those performed by the maids indoors. Thus, a janitor must look over the outside area and pick up any papers, broken glass, cans, or other debris he may find there. He then sweeps the sidewalk with a broom and his outdoor work is done. (Tr. 167, 250, 252, 372)

16. Grass cutting and other gardening is performed by some but not by the majority of custodial workers. (Tr. 55, 67, 68, 370, 422, 859) In fact, many schools have only concrete surrounding areas, with no grass. (Tr. 167, 227, 251, 370, 584, 601, 702, 703, 857, 1019) If there is a substantial grass area, the Board assigns a full time groundskeeper to tend it, and the male custodial workers do little if anything in connection with its care. (Tr. 189, 560, 720, 858, 1094) In those schools where custodial workers cut the grass, its care is only an occasional responsibility of the male, since it must be cut only once a week, in the summer months, and the men at that school take turns doing it. Thus an individual male may work on it only once in three or four weeks, if that much, during only a small portion of the year. (Tr. 134, 135, 136, 371, 670, 858, 984, 985) In some schools the grass area is so small it requires no mowing but only occasional weeding. (Tr. 371)

17. Snow removal too is only an occasional duty for the male custodial worker. The Board's central department plows clean the sidewalks of deep snows. (Tr. 704, 705, 854, 864, 865, 1094) The custodial workers thus have, for the most part, only the job of cleaning snow off the steps and entranceways or spreading salt. (Tr. 62, 95, 96, 98, 72, 199, 203, 262, 854, 855, 864, 865, 979, 989) This snow duty is not regular and recurring. In the past few years there has been very little shoveling of snow required of custodial workers. This winter, a relatively bad one, the men have shoveled only 3, 4 or 5 times, (Tr. 62, 268, 422, 457, 887, 989.), while last year they did it once. (Tr. 95, 268, 601, 706, 802) Some men have done none of it at all. (Tr. 95, 123, 136)

18. In summertime the custodial maids and workers begin general cleaning. The men and women work in teams. (Tr. 256, 266, 287, 313, 314, 349, 521, 674, 675) The women remove all the pupils' desks and chairs and carry them out in the hall. (Tr. 44, 109, 147, 221, 224, 240, 241, 256, 257, 337, 339, 387, 427, 448, 449, 501, 569, 619, 633, 687) Some push all the furniture, including teachers' desks and file cabinets, to one side of the room. (Tr. 8, 78, 107, 108, 152, 234, 235, 823, 1037) They wash down each piece of furniture with scouring powder to remove graffiti and other dirt markings, and also wash down the walls and baseboards of classrooms, hallways and bathrooms in a similar manner, polishing teachers' desks and woodwork on the moldings and doors. (Tr. 7, 223, 430, 448, 490) They clean out lockers (Tr. 449) and where machine stripping and buffing is not required, they sweep, wash, mop and wax floors. (Tr. 161, 313, 429)

19. Meanwhile, the men go through the classrooms and hallways with the scrubbing machines. First a custodial worker sweeps the floor, and then another man goes over it with the scrubbing machine. This is done to a floor once a year. (Tr. 223) Another custodial worker follows the scrubber with a mop to pick up loose water behind it. He may also use a vacuum machine for picking up water. Then the men apply wax to the floor with a mop and a buffing machine is run over it if necessary.

20. Some women work along with the men on the floor waxing detail, handling the water vacuum, and the maids have also used the same machine to clean rugs in the school library as part of their regular work. (Tr. 334, 338, 349, 350, 379)

21. Although the women do not run the buffing and scrubbing machines, there are also many men who do not. (Tr. 96, 97, 195, 285, 286, 363, 588, 806, 1004) Usually it is the same custodial worker in each team who continually runs the machine, while the other men do only the sweeping, vacuuming or mop waxing, which, as has been noted, the maids also do. (Tr. 7, 8, 33, 44, 108, 148, 158, 223, 242, 259, 313, 343, 426, 429, 932) On some waxing teams, the men may simply alternate, each using the machine for only a part of the time. (Tr. 128, 129, 864) The men who regularly handle the buffing and scrubbing machines are paid no more for so doing than are the men who do not.

22. The Board mechanics, carpenters, electricians and plumbers do the actual maintenance work in the schools. (Tr. 441) Only minor repairs and adjustments, requiring no trade skills, are left to the custodial staff. (Tr. 57, 58, 273, 457, 582, 596, 602, 776, 899, 984, 977, 1002) Thus the fixing of shades, repairing of a door check, boarding up a window, putting up a pencil sharpener, tightening a radiator joint, and the screwing in of lightbulbs, are for the most part, the only "repairs" made by the school's custodial workers. (Tr. 12, 57, 252, 253, 596, 707, 881, 884, 885, 970, 977, 995) Indeed, some custodial workers make very few, if any, of these repairs. (Tr. 253, 254, 272, 359, 419, 600) On the other hand, some women make minor "repairs", such as tightening a screw on a locker door, tightening a door check, cutting a combination lock off the locker with two-foot long cutters, plung-

ing an overflowing toilet, or tightening a plumbing joint. (Tr. 12, 35, 36, 57, 109, 239, 240, 309, 310, 340, 479, 480, 614)

23. Replacement of windows is left to the glazier. The custodial workers will do a temporary stop gap job with wood or cardboard which remains until the glazier comes; however, carpenters are also called upon to do this. The women often work with the men cleaning up broken glass off the floor.

24. It is a male who usually is called upon to climb an 8 to 14-foot ladder, held by another man, to replace a classroom ceiling bulb or upper shade. These same ladders may be used to replace higher lights in the auditorium or gymnasium, but in many cases the men can replace them from the floor with a long McGinnis pole, with a bulb cup or holder at the end. (Tr. 254, 717) If a higher ladder, or scaffolding work, is needed, the Board's central maintenance group is called upon. (Tr. 273, 977) Many custodial workers climb ladders very irregularly: once or a few times a week, once a month, once in 2 months, and even not at all. (Tr. 60–62, 125, 193, 275, 276, 405, 406, 971) In some schools the men work in teams throughout the building. In many cases the same man on the team always goes up the ladder; but that man is paid no more than his teammate, who merely holds the ladder and never goes up at all. (Tr. 92, 93, 193, 255, 256, 269, 272, 423, 799, 800, 806, 985, 1043, 1044)

25. Occasionally male custodial workers assist in moving deliveries of supplies to their storage place in the building. They do not, however, unload the trucks. These supplies consist mainly of materials such as books, paper, pencils, pads, and the like, or custodial supplies. Heavier deliveries of furniture or appliances are typically unloaded or placed in the school by the Board's laborers or outside contractors. In moving supplies the men may work in teams, or use hand trucks and elevators, to carry packages up and down stairs. Some deliveries consist of no more than seven or eight packages and take from 15 to 30 minutes to move. Night men rarely unload deliveries. Most shipments come in the day, in summer, or during holiday breaks. Thus, during the regular year, deliveries may come at a rate of only one a week, once in a few weeks, or months apart.

26. Custodial workers move classroom furniture throughout the building. (Tr. 1015, 1037, 1038) The females, in washing furniture during the year, and especially in the summer, also move furniture. Not a significant amount of every man's time is used in this moving. (Tr. 1042, 1043, 1046)

27. Servicing of water coolers is not a significant differentiation between male and female work. This activity takes very little time. (Tr. 133) Involved is merely the carrying of five gallon jugs of water from their storage area to the cooler. (Tr. 133) Many men have not performed this task, since many schools have only hall drinking fountains, not coolers. (Tr. 66, 67, 263, 603, 604) Moreover, at least one woman (Mankedick) also carried these jugs in a shopping cart, and received no extra pay for her efforts. (Tr. 43) Again, the men who carry jugs get paid no more for so doing than those who do not.

28. On November 4, 1958 the citizens of Jersey City, New Jersey, voted to adopt the provisions of the Civil Service Act of the State of New Jersey. Subsequently the State Civil Service Commission, in a survey of the Board's employment positions, recognized the two job categories of custodial maid and custodial worker, and included separate job specifications, setting out examples of work, educational and experience requirements, and the knowledge and abilities required, commensurate with the jobs. The commission also proposed salary ranges for each job category. (Ex. 15, p. 1)

29. On March 10, 1960 the Board adopted by resolution the Commission's proposed classes of positions and duties "except for the salary ranges indicated." (Ex. 15, p. 2) Instead, the Board set its

own salary ranges which resulted in a yearly salary for custodial workers which was some $330 more than that for custodial maid. (Ex. 15, p. 2)

30. In practice, therefore, the initial salary scales proposed by Civil Service to the Board were merely advisory, and not binding on the defendant. (Tr. 1108, 1114, 1142) Since that time it has continued to be the practice of the Commission to recognize the Board's power to set the pay for its employees, and the Board yearly passes pay schedules, then certifying them to the Civil Service Commission, and often amending them again in the same year by Board resolution, and recertifying them to the Commission. (Tr. 1111) Under these schedules, the pay differential between custodial maids and custodial workers has continued in favor of the men. The differential has steadily risen in every year for which back wages are sought here. (Ex. 1)

31. The Civil Service job descriptions of duties performed by the custodial workers and maids are not accurate for the period involved in this action. As the job specifications themselves state, the tasks listed (as distinct from the statement of knowledge and abilities required) are only "examples" of the kind of work which potentially may or may not be performed by members of the category. (Ex. 18) This classification system does not take into account the frequency with which such duties are performed or the number of category employees who do or do not actually perform those duties. (Tr. 1150–1151)

32. According to Mr. Schlachman, Chief Classification Officer of the Commission, unskilled janitorial positions in the Civil Service are often classified as noncompetitive by the Commission, and no test is required of applicants prior to their hire. (Tr. 1140) In this case many candidates for custodial worker and maid positions were given oral tests to qualify for their respective positions. (Tr. 80, 94, 112, 250, 267) The court has been presented with no evidence to justify a finding that these examinations for the male and female categories differed in any material respect. Testimony by one male employee further establishes that the tests for custodial worker only examined the applicant's knowledge of cleaning, and not of mechanics. (Tr. 250, see also 80, 81) Two male custodial workers have been employed at the higher male salaries for periods as long as 13 months and five years, respectively, without having taken the Civil Service examination. (Tr. 409, 423, 530) It is noted that the Civil Service job specifications for custodial worker and maid prescribe identical educational prerequisites and physical requirements. (See, however, 31, supra) The knowledge and abilities required of candidates for both jobs are also virtually identical in all respects. (Tr. 709, 710) In fact the only requirement set forth in the male job description, and not in the female job description, calls for knowledge of "making minor repairs to heating, electrical and other systems of varied types". (Ex. 18, Tr. 1143–1146) The facts show that repairs actually made by custodial workers are of the simplest kind, requiring no greater skill than the routine that is performed by maids. (Tr. 711, 712)

33. Prior to April 30, 1973, officials of the Board were informed that the Commission was reviewing the custodial maid classification. A number of possibilities were apparently being considered by the Commission. Among them were the inclusion of females in the eligible class for the hitherto all male custodial worker position, or the reclassification of custodial maids into a new male/female position entitled Building Service Worker. (Tr. 1099, 1119, 1122, Exs. 8, 16) On April 30, 1973 Dr. McCarthy, the Board's Superintendent of Schools, wrote to the Commission. His intent in that communication was to prevent women from being "put into the job of custodial worker". (Tr. 1125)

34. On June 12, 1973 the Commission informed the Board that the position of custodial maid was to be renamed with a neuter job title, to be called Building

Service Worker. (Ex. 17) However, the Commission had already tested and qualified women to hold the higher paying custodial worker position. (Ex. 11, promulgation date 11/22/72, 8/3/73, Tr. 1068) On September 13, 1973 the Board's new Superintendent wrote to the Commission to request that women who had qualified for the custodial worker position be instead certified to the Board for the lower paying Building Service Worker position. (Tr. 1054, Ex. 9) The letter also requested certification of men off the same list, for the higher paying custodial worker position. (Tr. 1089, 1090) Subsequently, women were regularly certified to the Board from the custodial workers' list for hire into the position of Building Service Worker. (Tr. 1055, 1076, 1078, 1089, Exs. 12, 20, certifications' date 8/20/73, 11/23/73)

35. The change in title of the custodial maid position to Building Service Worker did not equalize male and female rates of pay and represented only a change in the form, and not the substance, of the Board's pay procedures which procedures were and are violative of the Equal Pay Act. (Tr. 1080–1081, 1089, Ex. 1)

36. The work of some of the males is almost identical with that of females. As to other males, the only measurable differences lie in their doing certain outside work and using buffing and scrubbing equipment. The outside work, not performed by all males, does not occupy a substantial amount of time. It involves only a few hours of snow removal, and a few hours of grass cutting and hedge cutting and weeding during the entire year. It is thus only incidental and occasional. The use of buffing and scrubbing machines by certain, but not all, men occurs generally during the summer months. As has already been stated, the men who perform these "different" tasks are not paid at a higher rate than the men who do not.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this action pursuant to § 17 of the Fair Labor Standards Act (Act) of 1938, as amended (29 U.S. C. § 201 et seq.), in which the Secretary of Labor seeks an injunction against future violations of the Act and recovery of back pay for past violations.

2. As set forth in Finding of Fact 4, *supra*, the Board admits coverage under § 3(r) and 3(s)(4), the "enterprise" and "educational" provisions of the Act.

3. The Board has violated and is continuing to violate §§ 6(d) and 15(a)(2) of the Act by discriminating, within an establishment, between employees on the basis of sex by paying wages to female custodial maids (now called "Building Service Workers") in such establishment at salaries and resulting rates less than the salaries and hourly rates at which it pays male custodial workers in such establishment, "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ." 29 U.S.C. § 206(d)(1)

4. As set forth in Findings of Fact 8, 9 and 10, *supra*, a pay differential in favor of custodial workers, an all male class, over custodial maids, an all female class, has continued to exist at all times pertinent to this action.

5. Work performed by custodial workers and custodial maids has been, at all pertinent times, equal in skill, effort and responsibility, and performed under similar working conditions. The Court of Appeals of this Circuit has held in Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), that "equal work" does not mean "identical work," but only that the jobs "must be substantially equal." As that Court noted (421 F.2d at 265):

. . . Any other interpretation would destroy the remedial purpose of the Act.

The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-

old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.

In *Wheaton* the company's male and female selector packers both performed a number of common duties in tending the glass ovens, but the district court had found their jobs to be unequal because the men performed some sixteen additional tasks, much like the situation here where some custodial workers at times perform certain duties that the maids do not do. The extra tasks in *Wheaton* included, but were not limited to, the lifting and stocking of heavy or bulky cartons and materials, moving goods with a handtruck, climbing over cartons stacked on pallets, and performing minor mechanical adjustments such as attaching metal clips to glass containers or unjamming overhead conveyors and automatic belts. The Third Circuit, in reversing the district court, approved the rule that "different tasks which are only incidental and occasional would not justify a wage differential." 421 F.2d at 265, n. 10. The Court also stated: ". . . There is, therefore, no basis for an assumption that all male selector-packers performed any or all of these 16 additional tasks."; and the Court also noted that there was no indication these duties had "consumed a substantial amount of their time." 421 F.2d at 263.

■ That "equal work" means work of "substantial equality" is by now abundantly clear. Hodgson v. Brookhaven General Hospital, 436 F.2d 719 (5th Cir. 1970); Hodgson v. Fairmont Supply Company, 454 F.2d 490 (4th Cir. 1972); Hodgson v. Square D. Co., 459 F.2d 805 (6th Cir.), cert. denied, 409 U. S. 967, 93 S.Ct. 293, 34 L.Ed.2d 232 (1972); Hodgson v. Miller Brewing Co., 457 F.2d 221 (7th Cir. 1972); Hodgson v. Daisy Manufacturing Co., D.C., 317 F. Supp. 538, aff'd. per curiam 445 F.2d 823 (8th Cir. 1971); Hodgson v. American Bank of Commerce, 447 F.2d 416 (5th Cir. 1971).

Thus, in *Brookhaven*, the standard was succinctly explained (436 F.2d at 725):

As the doctrine is emerging, jobs do not entail equal efforts [and skill and responsibility] even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort [skill and responsibility], (2) consume a significant amount of the time for all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential.

The Department of Labor's Interpretative Bulletin states a comparable rule:

In substantial or minor differences in the degree of the amount of skill, effort and responsibility required for the performance of jobs will not render the equal pay standard inapplicable. . . . In determining [equality] it is pertinent to inquire to what extent significance has been given to such differences in setting the wage levels. . . . [29 C.F.R. 800.122]

Accordingly

a serious question is raised about the bona fides of a wage differential if it is paid to a male employee . . . required to do some heavy lifting, unless a similar distinction in wage rates is made . . . between male employees . . . where some do heavy lifting and others do not. [29 C.F.R. 800.128.]

■ Applying these rules in the instant case, the evidence is that the custodial maids and janitors perform common chores for the bulk of the workday, and that the different duties they perform are, in any case, substantially equal. The extra male duties consume a small percentage of time and are not performed by all men, thereby failing to meet the second and third tests of *Brookhaven, supra.*

*See also* Hodgson v. Montana State Board of Education, 336 F.Supp. 524 (D.Mont.1972); Hodgson v. San Diego Unified School District (S.D.Cal.1973), 71 CCH Lab.Cases 32, 920; Brennan v. Cenco Hospital & Convalescent Home Corp., 71 CCH Lab.Cases 32, 908 (S.D. Tex.1973); Hodgson v. Goose Creek Consolidated Independent School District, 71 CCH Lab.Cases 32, 904 (S.D. Tex.1973); Hodgson v. Waynesburg College, 66 CCH Lab.Cases 32, 542 (W.D. Pa.1971); Hodgson v. Grove City College Corporation, 66 CCH Lab.Cases 32, 555 (W.D.Tenn.1971). These cases all draw their vitality from this Circuit's *Wheaton* decision, and hold that jobs of school or hospital matrons, and male janitors, remarkably similar to the instant situation, are equal within the meaning of § 6(d) of the Act.

■ 6. The two jobs—custodial worker and custodial maid—entail equal skill and responsibility. The work here is manifestly unskilled. The only skill nominally required of males and not of females, by the defendant's own job description, is "knowledge of making minor repairs to heating, electrical and other systems . . . ." However, the men almost never make such repairs and "possession of a skill not needed to meet requirements of the job cannot be considered in making a determination regarding equality of skill." 29 C.F.R. 800.125

7. As for responsibility, that factor is concerned with "the importance of the job obligation." 29 C.F.R. 800.129. Here, neither category of employee supervises one another. Their cleaning obligations are equal. As emphasized in Finding of Fact 14, *supra,* these employees are neither watchmen nor security personnel.

■ 8. The male and female jobs here are also equal with regard to the factor of effort. Virtually all the custodial employees perform routine cleaning, wet and dry mopping, sweeping, scouring, polishing, dusting, washing, waxing and handling of trash. Some of the custodial workers perform one or more additional duties, but while these men are working at allegedly "male" tasks, the women are continuing with the regular routine, or themselves performing comparable odd jobs. For example, the effort involved in the moving of deliveries, or in extremely limited and infrequent snow shoveling, is balanced by the pushing of wet mops and brooms, scouring of bathrooms, shoving of furniture and the moving or carrying of garbage or personal supplies, regularly done by the females. Similarly, the physical input of the males on the buffing machine is certainly no greater than the physical effort required for the comparable female summer job of washing down furniture. Consistent with the *Wheaton* standard of "substantial equality," it is clear that "jobs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs." Here the "differences only in . . . kind of effort" did not justify the wage differential. 29 C.F.R. 800.127.

■ 9. While some males may work in different areas of the building, this does not legally differentiate their working conditions. Hodgson v. San Diego School District, *supra*; Finding of Fact 17. The statute adopts the flexible standard of similarity for testing its requirement and therefore "the fact that jobs are in different departments of an establishment will not necessarily mean that the jobs are performed under dissimilar working conditions." 29 C.F.R. 800.131. Here, of course, females and males throughout the school system work in all the same areas inside the building. A few males may infrequently work outdoors, or in some schools they may clean the stairways and halls, while the women clean the rooms, but all employees clean approximately the same square footage of space and perform the same basic tasks. Nor does the difference in heights of ladders used by the men and women, occasionally and intermittently, constitute a material differ-

ence. Hodgson v. Montana State Board of Education, *supra*, 336 F.Supp. at 525.

10. As Conclusion of Law 9 demonstrates, the evidence showed a pattern of similarity of job duties performed by all custodial maids and workers from building to building. Differences between schools were minor and do not materially affect the court's finding of equality. The defendant pays all custodial workers pursuant to the same salary schedule, regardless of where they are employed.

11. Neither the extra male duties alleged by defendant, nor its claimed adherence to New Jersey Civil Service laws or private collective bargaining agreements are "factors other than sex" or valid defenses to the illegal pay differential.

Section 206(d)(1)(iv) of 29 U. S.C. permits unequal pay for equal work if the payment is made pursuant to a differential based on "factor[s] other than sex." The burden of proving this exception to the wage paying provisions of the Act rests squarely on the defendant, plaintiff having proved a prima facie case. Schultz v. Wheaton Glass, *supra*, 421 F.2d 266, 267 (3d Cir. 1970). Defendant has not sustained its burden.

12. The extra male duties of outside work and inside buffing and waxing are too incidental and insubstantial to render the jobs unequal and thus are not valid "factor[s] other than sex" under the Act. "To come within the excepting provisions . . . a factor must be applied equally to men and women." 29 C.F.R. 800.142. Here every male gets the higher rate of pay whether he performs all, some, or none, of the enumerated additional duties, and no woman is paid extra when she performs the same or other substantially equal tasks. There is no relation between pay received and actual duties performed. (Tr. 269, 272, 423, 799, 800, 806, 985, 1043, 1044)

13. An invalid classification system administered in this fashion does not become valid simply because it is approved or promulgated by the state Civil Service Commission. The state's apparent recognition or acceptance of the concept that jobs may be different or unequal is not evidence that the jobs are truly unequal or that the different classifications are bona fide under the Act. The Department of Labor's Interpretative Bulletin states that:

> In making a determination as to application of the equal pay provisions . . . legal restrictions in State or other laws upon the employment of individual . . . will not be deemed to make otherwise equal work unequal or be considered per se as justification for an otherwise prohibited differential in wage rates . . . . For example . . . the fact that there is an upper limit set by state law on the weights that may be lifted by women would not justify a wage differential to male employees who are not regularly required to lift substantially greater weights or expend the extra effort necessary to make the jobs unequal. 29 C.F.R. 800.163.

By analogy, the male employees in Jersey City are not entitled to more pay simply because some of them may perform a task outside the confines of the Civil Service job specification adopted for the female job:

> The requirement of equal pay in such situations depends on whether the employees involved are actually performing "equal work" as defined by the [Equal Pay] Act, rather than on legal restrictions which may vary from State to State. Ibid.

14. Defendant cannot justify the pay differential here on the basis of Civil Service examination qualifications. As set forth in Finding of Fact 32, *supra*, defendant has shown no material difference between the male and female examinations taken, nor the prerequisite requirements for the respective job titles. The jobs of custodial maids and custodial workers are substantially equal, and, in the absence of evidence to the contrary, tests measuring the skills and knowledge needed for the perform-

ance of the two jobs must be deemed equal. These tests may not be relied upon to the extent that they measure skills or knowledge "not needed to meet requirements of the job." 29 C.F.R. 800.125; Griggs v. Duke Power Co., 401 U.S. 424, 432, 433, 91 S.Ct. 849, 28 L. Ed.2d 158 (1971).

15. The Board's claim is that it had to follow the Civil Service Classification System, and that it was thus bound by state law to violate the Equal Pay Act. Even if this were true, it would be no defense to the violations here. In Kober v. Westinghouse Electric Corporation, 480 F.2d 240 (3d Cir. 1973), the Court of Appeals affirmed the district court's decision holding that Title VII of the Civil Rights Act of 1964 had "superseded" a Pennsylvania labor statute protective of females which conflicted with the federal law. The Court held that "reliance on conflicting state statutes is an intentional unfair employment practice . . . [one] engaged in deliberately and not accidentally." 480 F.2d at 246. This same rule is applicable to the Equal Pay Act. As the Department of Labor's Interpretative Bulletin provides:

> The provisions of various state or other equal pay laws may differ . . . [but] compliance with other applicable legislation will not excuse noncompliance with the equal pay provisions of the Fair Labor Standards Act. 29 C. F.R. 800.160

16. Moreover, this court need not even reach *Kober.* The New Jersey Civil Service laws here are not inconsistent with the Equal Pay Act. Defendant could have complied with both. The applicable state statute provides that:

> The [civil service] commission shall prepare classifications and suggest standards of salaries or wages to be paid . . . employees in the . . . school districts. . . . All . . . school districts shall . . . comply with the requests of the commission for information relative to duties, qualifications, character

of work, hours . . . and compensation . . . in order that such standardization and classification may be made and established. N.J.S.A. 11:24.1

Thus the Commission sets the job categories after it is advised and informed by the Board. But the Commission merely "suggests" the pay differential; the Board is not bound to accept the proposed compensation plan. If it does, it is free to repudiate these pay scales at any time by resolution.

Thus the pertinent regulations of the New Jersey Civil Service Commission provide that:

> The compensation plan of any local jurisdiction shall consist of the pay plan adopted by the governing body of that jurisdiction. The Department of Civil Service shall recommend standards of salaries to be paid employees and encourage the use of equitable compensation plans in local jurisdictions. N. J.A.C. 4:1–7.1(b)

Further,

> in local service, [i. e.: Board of Education as opposed to State service] the administration of the compensation plan shall be in accordance with the provisions of that plan as established by the local jurisdiction. N.J. A.C. 4:1–7.3(b)

Under the New Jersey Education Law, the Board of Education is the governing body specifically invested with the power to "employ . . . janitors and other . . . employees . . . and fix and alter their compensation . . . ." N.J.S.A. 18A:16–1.

17. The Board not only had full power to equalize male and female pay in this matter. It could have petitioned the Civil Service Commission to reclassify the female job category and combine it with the male category. Under regulation N.J.A.C. 4:1–6.5 the Commission can order reclassification "[w]hen the duties and responsibilities of a position change . . . and the class title is no longer appropriate." As set forth in Findings of Fact 33 and 34, agents of

the Board, instead, acted to preserve the distinction between the two categories.

■ 18. The Board may not rely upon its union contract to justify the violation of the Equal Pay Act. It is well estabished that:

no agreement between a company and a union, even if arrived at as a result of collective bargaining negotiations can be used as a defense by . . . [an employer] to the statutory requirements.

Hodgson v. Sagner, 326 F.Supp. 371, 375 (D.Md.1971), aff'd. sub nom. Hodgson v. Baltimore Regional Joint Board, Amalgamated Clothing Workers of America, 462 F.2d 180 (4th Cir. 1972).

■ 19. An injunction against future violations of the Equal Pay Act by the defendant is necessary to effect the policies of the Act. The Third Circuit recognized, in its second decision in Hodgson v. Wheaton Glass Co., 446 F.2d 527, 533 (3d Cir. 1971) (*Wheaton II*) that "§ 17 [the Act's injunctive remedy] reflect a congressional decision to create a broad new enforcement mechanism." That machinery "was designed and enacted as a necessary measure to assure the effective and uniform compliance with and adherence to public policy, relating to wage standards for labor, adopted in the National interest." Wirtz v. Jones, 340 F.2d 901, 903 (5th Cir. 1965).

■ Even in cases where the defendant has ceased violating, an injunction is proper. Under the Supreme Court's holding in Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 15, 89 L.Ed. 29 (1944), "discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power . . . [where the employer] has consistently urged the validity of the [pay practice] and would presumably be free to resume [its] use . . . were not some ef-

fective restraint made." Accordingly, an injunction should issue "[w]here the legality of an employer's previous acts remains in controversy . . . ." McComb v. Wyandotte Furniture Co., 169 F.2d 766, 770 (8th Cir. 1948). Here violations have continued to the date of trial. In fact, the Board has continuously, though erroneously, insisted that it is immune from federal law and prevented by state law from raising pay rates. The need for an injunction is compelling, especially since this type of order "subjects the defendants to no penalty, to no hardship. It requires the defendants to do what the Act requires anyway—to comply with the law" Mitchell v. Pidcock, 299 F.2d 281, 287 (5th Cir. 1962).

■ 20. Equity, and the rights of the women involved, further dictate that "in order to give full relief [the decree must] necessarily include a provision requiring the payment of wages illegally withheld . . . as well as one prohibiting any future violations of law." Hodgson v. Sagner, *supra*, 326 F.Supp. at 373. Section 17 expressly provides for a restraint against nonpayment of back wages and the Act's § 6(d)(3) specifically includes "amounts owing to any employee . . . in violation of [the Equal Pay Act]." As Chief Judge Cohen of this district stated in his decision in *Wheaton II*:

It would be a hollow victory, indeed, for the Secretary to litigate with an offending employer over a five year period, only to secure his future compliance. If that were the sole purpose of the legislation . . . then an unjust enrichment of the offending employer by foreclosing the Secretary's recovery of improperly withheld wages would result. 319 F.Supp. 229, at 232.

Here we have already completed 2¼ years of litigation and violations cover 2 additional years prior to the filing of this complaint. The nonpayment of

equal wages has, throughout this time, been a continuing offense against the public interest. Unless the Board is restrained from further withholding wages the employees will have a legal right to money without any means to enforce it. Wirtz v. Malthor, Inc., 391 F. 2d 1, 3 (9th Cir. 1968) ; thus an injunction will issue.

■ 21. The court further concludes that the defendant is obliged to pay interest at the prevailing rate compounded annually upon all back wages due the female custodial maids. In *Wheaton II* the Court of Appeals affirmed the awarding of interest on back wages from the date of underpayments. Judge Cohen had set forth his reasoning for the award of back wages as follows:

. . . In the instant case, withholding of proper wages subjected the employees to substandard living, contrary to the objectives of the Act, to the extent that their purchasing power was reduced as contrasted with their male counterparts. The primary purpose for the allowance of interest, in the exercise of judicial discretion, is to make those employees whole . . . . 319 F.Supp. at 236.

In accord with the Third Circuit's view is the decision of the Court of Appeals of the Eighth Circuit in Hodgson v. American Can Co., Dixie Products, 440 F.2d 916 (1971). There the District Court allowed interest only from the date the defendant equalized the employees' rates, several years after the violations and suit had been commenced 314 F.Supp. 1192 (D.Ark.1970). In reversing that portion of the judgment which limited the award of interest, the court stated:

. . . American Can was unjustly enriched and the female employees were damaged. During the entire period [the employer] has had the use of the money, and equity and justice requires payment by way of interest

for its use. The interest should be allowed from the dates of the underpayment . . . . 440 F.2d at 922.

The Eighth Circuit again reversed *per curiam* a district court's refusal to award interest on back wages in Hodgson v. Daisy Manufacturing Co., 445 F. 2d 823 (1971).

The Board here had the use of unpaid back wages and the women did not, solely because of their sex. Interest will therefore be included in the decree.

22. Kober v. Westinghouse Electric Corporation, *supra*, provides the Board with no defense to any of the remedies this court has determined to apply. In *Kober* the Court of Appeals affirmed, as no abuse of discretion, the district court's denial of injunctive remedies and back wages in a Civil Rights Act Title VII suit. Westinghouse Company had refused to promote the female plaintiff based upon Pennsylvania state statute which prohibited women from working the hours required by the job. The Court found that the employer's good faith overshadowed the plaintiff's interest in recovery. The equities in an Equal Pay Act case are more squarely in favor of the employees. In *Kober,* the plaintiff sought higher back wages commensurate with a more difficult job she had not performed, which required longer hours she had not worked, albeit due to a violation of law. In the instant case, the females have all worked and earned the back wages in issue, at jobs equal to those of their higher paid male counterparts. Thus, in an Equal Pay Act case, the court

in the exercise of equitable discretion . . . must concern itself with all equities, and not just with the myopic view of one. The affected employees as well as [the employer] have rights and equities to be considered . . . [and] Equity dictates that the balance lies in favor of the Secretary on behalf of the employees. Shultz v. Wheaton Glass, 319 F.Supp. at 236.

Moreover, to begin to qualify for the *Kober* defense the defendant must show that it is "in good faith" current compliance and "caught in a dilemma between the conflicting provisions of state and federal law." 480 F.2d at 247, 249. Westinghouse promoted Miss Kober "almost twelve months [before] the judicial determination of the lower court . . . that the state statutes were invalid." *Id.* Here the Board of Education is still in violation. It has never been caught between conflicting federal—state laws. As set forth in Conclusions of Law 15, 16 and 17, *supra,* the Board at all times retained the power to equalize wage rates, consistent with the Civil Service statute and rules. Instead it has increased the differential between the sexes since commencement of this action and has continued in violation up to the date of this opinion.

23. The court does not now have evidence of the total back wages due before it. Pursuant to the Pre-Trial Order the parties agreed to postpone final computation of wages owing until the court rendered this decision. [¶ V(g)] The parties have agreed therein that such wages shall be computed for each affected female by taking the difference between the salary she actually received and the salary she should have received had she been paid at the salary rate for male custodial workers with the same length of time worked, as set forth in the applicable salary schedule covering the different periods of her employment. [¶ V(g)] The parties also agreed that the 2-year statute of limitations found in the Portal to Portal Act, 29 U.S.C. § 255, shall be applied. Accordingly, back wages and interest are due for all female custodial maids employed by the Board since December 1, 1969, for the full period of their employment with the Board after that date, up to and including the date upon which the Board shall cease violation.

An appropriate form of Judgment should be submitted in conformance with the foregoing Findings and Conclusions.